IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

PARTYLITE GIFTS, INC.,

   Plaintiff

              Case No. 8:10-cv-01490-JDW-EAJ

vs.

              DISPOSITIVE MOTION

TARIE MACMILLAN,

   Defendant.

_____

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

   Pursuant to Federal Rule of Civil Procedure 56 and Middle District Rule 3.01, Defendant, Tarie MacMillan ("MacMillan"), moves for summary judgment on Counts I and II (breach of contract), Count III (misappropriation of trade secrets), Count IV (tortious interference), and Count V (injunctive relief).  In the alternative, MacMillan moves for partial summary judgment as to claims I and IV.

## INTRODUCTION

   Plaintiff "PartyLite" uses its pyramid sales organization to sell candles at neighborhood "home parties."  PartyLite encourages its sales force to publicize their relationship with the Company – to hold more "home parties" and sell more candles.  This "pyramid" network includes over 20,000 salespeople (independent contractors), but it experiences terribly high turnover.  PartyLite energizes its sales force (and attracts new recruits) with its freely and widely distributed magazine that trumpets individual success stories in the candle-selling business.

   This lawsuit arose when MacMillan -- a long-time member of PartyLite's sales force

-- decided to stop selling PartyLite's candles and, instead, began selling "Park Lane's" jewelry.  After deciding to leave PartyLite, MacMillan told about thirty (friendly) co-workers (among literally hundreds of people she already knew at PartyLite).  About thirteen of those people later joined Park Lane.

And so, PartyLite contends MacMillan's knowledge of the <u>names and contact information</u> of her friends and colleagues who sold candles was a protected, statutory "trade secret."  As a matter of law, PartyLite's trade secret claim fails; likewise, PartyLite's tortious interference claims are preempted.  Additionally, PartyLite's post-employment restrictive covenants imposed on MacMillan 13 years after her affiliation with PartyLite are unenforceable.  Summary judgment should therefore be entered in favor of MacMillan.

## UNDISPUTED MATERIAL FACTS

***PartyLite's Salesforce:*** PartyLite is a direct sales company.  It uses only independent contractors, who are paid by commission, to sell the Company's candles at "shows" or "parties" held in "hosts" or "hostesses" homes. *(<u>A.6</u> Lawrence[1] 33:6-20; A.1 ¶4; <u>A.11</u> 14:13-15:18).*  PartyLite refers to those within its salesforce as "Consultants" and "Leaders." *(<u>A.6</u> 39:2-12; <u>A.10</u> Norris[2] 38:24-39:5).*  PartyLite has over 20,000 *active* persons in its salesforce. *(<u>A.6</u> 11:2-12:1; <u>A.10</u> 26:4-6).* The majority of PartyLite's salesforce is made up of Consultants that PartyLite allows to sell for more than one direct sales company. *(<u>A.3</u> 57:10-58:4; <u>A.10</u> 77:5-13, 79:20-23, 80:21-81:7).* Their average tenure with PartyLite is

---

[1] Lawrence is PartyLite's Vice President of Opportunity Development and Worldwide Relations.  She has been employed by PartyLite since 1991. *(<u>A.6</u> 7:4–8:4).*

[2] Norris is PartyLite's President and designated corporate representative. *(<u>A.10</u> 9:2-16, 11:17-12:21).*  He has been employed with PartyLite since 2010. *Id.*

very short. (_CA_.1 _38:12-16_).  Less than 5% of its 20,000+ salesforce are "Leaders." (_A.10_ _26:18-22_).

PartyLite directs its new Consultants to develop a contact list of potential hosts and hostesses by listing friends, relatives, acquaintances, neighbors, and their kids' contacts. (_A.3_ _186:1-187:23; A.10 47:3-50:22; A.21_).  As part of each home party, a Consultant distributes materials about becoming a PartyLite salesperson and attempts to recruit attendees to join the PartyLite sales field. (_A.3_ _187:24-188:4, 188:5-190:19, 194:17-195:12; A.6 15:7-17; A.10_ _38:19-23, 45:22-46:7, 50:23–51:11; A.22_).  This can help a Consultant move up PartyLite's hierarchical structure by successfully recruiting new Consultants who in turn sponsor other new Consultants, creating a chain of salespeople referred to as a "downline" upon which the Consultant earns a commission on their sales[3] (_A.6_   _8:15-9:12, 9:22-10:9_).  Once a Consultant achieves a certain level of sales and number of recruits, he or she is eligible to become a "Leader." (_A.6 8:15-9:12_).   Leaders earn commissions on their own sales and the sales of others below them in their downline. (_A.3 16:11-17:4_). A Leader motivates, leads, mentors, and trains those in his or her downline. (_A.3 101:25-102:11_).

**_PartyLite's Publicly Available Information About Its Salespeople:_** PartyLite publishes a monthly magazine called "Achieve" which contains lists of Consultants and Leaders recently promoted, and various sales and recruiting successes.  (_A.17; A.5 123:13-124:3; A.6 109:18-25, 110:14-111:8, 114:22-123:12_. Among other things, it identifies by name, region (or downline), and exact dollar sales figures, those in the Executive Club (selling $10,000 or more) and the Elite Executive Club (selling $25,000 or more).  _Id._

---

[3] The term "lineage" is interchangeable with "downline." (_A.3 92:2-4_).

*Achieve* also identifies the top 200 salespeople and those salespeople who have had recruiting success.   *Id.*   The magazine is distributed to each PartyLite's 20,000+ Consultants and Leaders and those "recognized" are not restricted to people in a particular downline.   (*A.6 110:23-111:12; A.14 84:19-85:20).*   There are no confidentiality warnings on the magazine and no restrictions barring the sales field from sharing *Achieve* with others.   (*A.17; A.6 112:2-10, 124:25-127:13).* Two recent issues of *Achieve* were available to the public on the internet.   (*A.39 ¶5-8; A.40-43*).   A few years ago, PartyLite's magazine was called *Reflections*, and issues were available for purchase on eBay.   (*A.6 18:4-15, 109:18-21; A.39 ¶34; A.70).*

PartyLite's website allows anyone with access to the internet to search for a Consultant or Leader by name. (*A.6 16:14-17; A.39 ¶13; A.47; A.19).*   In addition, PartyLite encourages its sales people to promote themselves using social media outlets such as Facebook, Twitter, My Space, YouTube, Flickr and Yahoo.   (*A.3 192:1-13; A.10 144:18-145:8; A.23 PLG 1327).*   Consultants and Leaders also are encouraged to have personal websites, distribute business cards, purchase ads, attend networking groups, apply car decals, and wear apparel announcing to the world they are associated with PartyLite. *(Id., A.5 107:11-109:12, 111:22-117:19; A.6 23:6-14, 104:10-16, 105:16-20, 106:21-107:15, 108:21-109:17; A.8 101:6-108:14, A.9 5:3-8, 6:1-3, 26:12-28:5; A.10 47:16-22; A.14 68:25-80:25, 85:21-86:13; A.15; A.16; A.24; A.26; A.27; A.28; A.29; A.30; A.31; A.32; A.33; A.34; A.39 ¶13; A.47).*   A Google search of "partlite.biz" or "PartyLite Consultants" leads to the websites of hundreds of PartyLite salespeople, many, if not all, of which provide that salesperson's contact information. (*A.39 ¶ 10-12, 14-17; A.44-46, 48-51*).

PartyLite provides its Leaders with reports regarding their downline's past performance. (*A.3* 121:9-25).   Leaders do not see reports for other lineages. (*A.1* ¶9).   In many other contexts, however, multiple downlines interact.  For instance: PartyLite training sessions involve multiple downlines; PartyLite has incentive trips inclusive of all downlines; and PartyLite holds an annual convention for its entire sales field and their guests. (*A.1* ¶¶8, 15, 16; A.*3* 20:4-23, 21:7-15, 36:14 – 37:2; *A.5* 127:8-128:6; *A.6* 139:23- 141:16; *A.10* 42:13-43:11; *A.14* 6: 2-18; 68:18-24, 84:4-18).  There are no confidentiality agreements signed prior to or during trips or the convention. (*A.1* ¶¶ 15, 16; *A.6* 140:17-21).

PartyLite hosts a "community live" web forum, which allows its salespeople to network and post on various topics. (*A.6* 138:7-12; *A.12* 105:13–106:4).   Access to the forum is not restricted by downline; rather, any one of the over 22,000 PartyLite Consultants and Leaders can access the forum.  *Id.* Forum posts can also be accessed by non-PartyLite persons over the internet via a simple Google search. (*A.39* ¶20-21; *A.56-67*).

**_MacMillan:_**  MacMillan joined PartyLite as a Consultant in 1993 and signed a Consultant Agreement. *(A.* ¶5).  By 1995, MacMillan had become a Leader and had obtained the highest title (Senior Regional Vice President) available to PartyLite independent contractors. *(A.* ¶7).  In 2006, PartyLite introduced the Leader Agreement that contained restrictive covenants at issue in this lawsuit. (*A.3* 110:6-8).  The "Non-Solicitation Clause" states:

> I further agree that, during the term of this Agreement **and after the term ends and thereafter**, I **shall not solicit or otherwise attempt to persuade any PartyLite Consultant or Leader to sell, resell or promote products of any other direct sales company**, or cease to be a Consultant or Leader of [PartyLite].

(*A.18* emphasis added).

The "Non-Competition Clause" states:

> **I may accept employment or other engagements** and may participate in other activities without obtaining the Company's approval thereof; **provided, however**, that such employment, other engagements and activities do not violate this Agreement and **do not involve selling, reselling, promoting products, or actively representing other direct sales companies <u>that are similar to or competitive with</u>** [PartyLite].

*(A.18 emphasis added).*[4]  Although she was not given a raise, promotion, or any change in her job duties, MacMillan signed the document. *(A.1 ¶13; A.18)*.  Other Leaders did not. *(A.4 22:14-20, 23:7-21)*.

After years of declining earnings, in May 2010, MacMillan interviewed with Park Lane, a direct sales company that has been in the business of selling jewelry for over 50 years. *(A.1 ¶17)*.  MacMillan joined Park Lane. *(A.1 ¶18)*.  MacMillan, then told approximately 30 people that she had personal relationships with within her PartyLite downline that she was leaving PartyLite. *(A.1¶20; A.6 77:16-19)*. Half of those people were Consultants (not Leaders) *(A.1 ¶20)*.  They all asked where she was going and she told them Park Lane.  *(A.1 ¶21; A.37 ¶ 8)*.  If someone expressed an interest in learning more about Park Lane, MacMillan put them in touch with a Park Lane representative. *(A.1 ¶21)*. Thirteen of the people MacMillan spoke to in June 2010 joined Park Lane (and nine of them were Consultants). *(A.1 ¶22)*.  In addition to those individuals that she contacted, other PartyLite people called MacMillan to ask her about her departure after they learned about her departure from PartyLite. *(A.1 ¶24; A.13 29:24-32:12;)*.  Some of those people joined Park

---

[4]      The Non-Solicitation Clause and the Non-Competition Clause may be referred to herein, collectively, as the "Restrictive Covenants."

Lane. (*A.1 ¶24*). Finally, some PartyLite independent contractors with whom MacMillan never had any contact joined Park Lane. (*A.1 ¶25*).

MacMillan was terminated from PartyLite by letter dated June 25, 2010. (*A.20*). Four days later, she conducted her first Park Lane show. (*A.1 ¶31*).

***The Lewandowski Suit:*** PartyLite also sued another Senior Regional Vice President – Mary Grace Lewandowski ("the Lewandowski suit").[5]  Lewandowski and MacMillan were not in each other's PartyLite downlines. (*A.1 ¶9; A.38 ¶5*).  After being informed by PartyLite that MacMillan had joined Park Lane, Lewandowski contacted MacMillan via Facebook and telephone to and asked why MacMillan had left.  (*A.38 ¶7*).  During the telephone conversation, Lewandowski expressed interest in learning more about Park Lane so MacMillan put Lewandowski in touch with Shannon Pell.[6] (*A.38 ¶8*).  Lewandowski called Pell. (*A.11 190:11-21*).  Thereafter, Lewandowski interviewed with Park Lane as well as another direct sales company and ultimately decided to join Park Lane.  (*A.38 ¶11-12*).

## MEMORANDUM OF LAW AND ARGUMENT

## A.  COUNT II:  BREACH OF CONSULTANT AGREEMENT

MacMillan is entitled to summary judgment as to the Breach of Consultant Agreement claim because the contract she signed in 1993 does not purport to prohibit

---

[5]  PartyLite sued Lewandowski in the Eastern District of Missouri, Case No. 4:10-cv-01567-SNU. On October 12, 2011, the Missouri District Court denied PartyLite's Motion for Preliminary Injunction *(A.68)* and dismissed PartyLite's breach of contract, tortious interference, and injunctive relief claims with prejudice *(A. 69)*.

[6] Pell is an independent contractor with Park Lane who was formerly associated with PartyLite. *(A.11 8:20-9:5, 30:4-5)*.

MacMillan's alleged misconduct.[7]  There have been no amendments to the 1993 Consultant Agreement.  *(A.1 ¶5).*

PartyLite contends MacMillan breached her 1993 Consultant Agreement by: (a) using PartyLite's information to recruit PartyLite salespeople to join Park Lane; (b) disparaging PartyLite; and (c) misrepresenting PartyLite's financial condition and the enforceability of PartyLite's contracts.  *Dkt. #1 ¶ 66.*  The 1993 Consultant Agreement does not address such conduct.   And so, PartyLite contends that MacMillan breached her 1993 Consultant Agreement by failing to comply with "company procedures" regarding "confidential and proprietary information including those set forth in the "Consultant Guide" prepared in 2010. *Dkt. #1 ¶ 32, Ex. B.* However the 2010 Consultant Guide, was not in effect in 1993 when MacMillan signed the Consultant Agreement.  *(A.4 29:21-30:24).* Moreover, the 1993 Consultant Agreement does not contain the terms "Consultant Guide," "company procedures," or "confidential and propriety information."  *(A.36).*  Indeed, PartyLite's Rule 30(b)(6) witness admitted that the 1993 Consultant Agreement does not say that MacMillan agreed to be bound by any other document (such as the 2010 Consultant Guide) or that MacMillan agreed to be bound by any changes to that document.  *(A.10 58:14-21).*  PartyLite also admitted that the 1993 Consultant Agreement does not mention confidential information. *(A.10 56:11-15).*  The "contract" that MacMillan actually signed contains only limited promises -- that MacMillan agreed to follow "recommended guidelines and procedures concerning" product representations, incentive programs and contests -- *matters unrelated to the alleged breaches.  (A.36).*

---

[7] Lisa Brown's 1993 Consultant Agreement is an exemplar of what MacMillan signed. *(A.10 52:2--17; A.36).*

The 1993 Consultant Agreement does not prohibit disparagement or MacMillan's disclosure of PartyLite's financial condition, discussing the enforceability of its contracts, voicing opinions regarding PartyLite or sharing information she has learned about PartyLite. In sum, MacMillan is entitled to summary judgment on Count II because MacMillan's Consultant Agreement does not prohibit her from doing any of the things that PartyLite alleges were a breach of contract.   In the Lewandowski suit, the trial court dismissed PartyLite's claim with prejudice under similar circumstances. *(A.69, Dkt. #54-1, p. 13-15.).*

## B.  COUNT I:  BREACH OF LEADER AGREEMENT

PartyLite seeks to enforce "Non-Solicitation" and "Non-Compete" clauses in its standard Leader Agreement *(A.18),* which is governed by Massachusetts law.[8] PartyLite's own "choice of law" is curious, because under Massachusetts law, post-employment restrictive covenants are disfavored, carefully scrutinized as restraints on trade, and ***strictly construed against the employer***.   *See e.g. Wilkinson v. QCC, Inc*., 2001 WL 1646491, *1 (Mass. Ct. App. Dec. 21, 2001) *Proctor Group Ins. Agency, Inc. v. Jones*, No. 2006-2050-A, 2008 WL 2875452, at *1 (Mass. Super. Ct. Jun. 6 2008); *Alexander & Alexander, Inc. v. Danahy*, 488 N.E. 2d 22, 28 (Mass. App. Ct. 1986). Such disfavored, carefully scrutinized restrictive covenants are unenforceable in Massachusetts unless they are: (1) necessary to protect a legitimate business interests of the employer; (2) supported by consideration; (3) reasonably limited in time, space and subject matter; and (4) consonant with the public interest.  *IKON Office Solutions, Inc. v. Belanger*, 59 F. Supp.2d 125, 128 (D. Mass. 1999);

---

[8] The Leader Agreement provides Massachusetts law governs.   Therefore, Massachusetts law governs unless the enforcement of any of the provisions violates Florida's public policy. *See Mazzoni Farms, Inc. v. E.I DuPont De Nemours & Co*., 76 So. 2d 306, 312 (Fla. 2000).

*People's Choice Mortgage, Inc. v. Premium Capital Funding, LLC* No. 063958BLST, 2010 WL 1267373, * 10 (Mass. Super. Ct. Mar. 31, 2010).

Here, PartyLite contends MacMillan breached her Leader Agreement by: (a) joining Park Lane's salesforce; (b) recruiting and/or attempting to recruit PartyLite salespeople to join Park Lane; (c) using PartyLite's proprietary information to recruit PartyLite salespeople to Park Lane; (d) disparaging PartyLite and misrepresenting PartyLite's financial condition and the enforceability of PartyLite's contracts with its salespeople. *Dkt. #1 ¶ 62.* As set forth below, these provisions cannot survive the heightened scrutiny Massachusetts law gives to restrictive covenants. Indeed, MacMillan is entitled to summary judgment on Count I (Breach of the Leader Agreement) because: (1) MacMillan did not receive adequate consideration; (2) the Non-Solicitation Clause is not reasonable and necessary to protect a legitimate business interest; (3) the Non-Solicitation clause is overbroad and overlong; (4) MacMillan cannot be liable for "indirect" solicitations; and (5) the Leader Agreement does not contain a non-disparagement clause.

    1.        **The Leader Agreement Is Unenforceable Because There Was No Consideration**

Massachusetts refuses to enforce an employee's restrictive covenant <u>unless</u> the employee receives something extra. *Cypress Group,* 2004 WL 616302, *3 (Mass. Super. Ct. 2004) ( "Anytime a restrictive covenant is signed by an employee the employer must provide some clear additional benefit.") In short, a restrictive covenant agreement must be supported by consideration. *Id.* In *Metropolitan Removal Co. v. D.S.I. Removal Specialists, Inc.,* No. 20051503, 2006 WL 619111 at *1-2 (Mass. Super. Ct. Feb 2, 2006), the court held that non-

competition and non-solicitation agreements signed during continued at-will employment were not valid because the covenants lacked consideration.  There the employee had not received increased compensation or increased authority and his job title and position did not change upon or shortly after signing the agreement. *Id.*

Here, MacMillan received no "additional benefit" or consideration in exchange for her agreement to be bound by a Non-Compete and a worldwide and perpetual Non-Solicitation Clause enacted 13 years after MacMillan began her at will relationship with PartyLite.  When MacMillan signed the "Leader Agreement" in 2006, she received no raise, promotion or increased authority (she had been a Senior Regional Vice President with PartyLite since October 1995).  Rather, all MacMillan allegedly received was the right and privilege to participate in the Profit Plus program – a "right and privilege" she already had since she became a Leader in 1993. *(A.1 ¶6-7)*.  Further, the Profit Plus Program did not change at all in connection with PartyLite's implementation of the Leader Agreement. *(A.4 37:11–38:3)*.  Finally, MacMillan's continued "independent contractor" relationship with PartyLite was not dependent upon signing the Leader Agreement.  PartyLite concedes that not all of its Leaders signed the Leader Agreement and those who did not sign did not have their titles revoked, compensation decreased or relationship changed. *(A.4 35:1-18, 36:5-38:3)*.  Thus, the Restrictive Covenants were not supported by any consideration and are unenforceable.

2. **The Non-Solicitation Clause Is Not Reasonable And Necessary To Protect Any Legitimate Business Interest**

To be enforceable, a restrictive covenant must be both **reasonable and necessary** to protect a legitimate business interest of the protected party.  See e.g. *Edwards v. Athena Capital Advisors, Inc.,* No. 072418E, 2007 WL 2840360, * 2 (Mass. Super. Ct. Aug. 9,

2007). If it is not, the clause is invalid and unenforceable. Massachusetts recognizes three types of legitimate business interests: (1) trade secrets, (2) confidential information, and (3) the good will the good will the employer has developed over the course of its dealings with its customers of the employer. *Id*. quoting *All Stainless, Inc. v. Colby,* 364 Mass. 773, 778-780 (1974). Protection from ordinary competition is not a legitimate business interest. *Richmond Bros., Inc. v. Westinghouse Broad. Co*., 256 N.E.2d 304, 307 (Mass. 1970).

Here, Plaintiff claims that its legitimate business interests are PartyLite's: (1) reputation; (2) confidential business information; (3) relationship with its salespeople; and (4) relationship with its candle-selling hostesses. Dkt. #1 *¶31*. Of these, the only legitimate business interest recognized by Massachusetts is PartyLite's alleged confidential information, but that fails to justify enforcement of the Non-Solicitation Clause because: (a) the information PartyLite claims to protect is not confidential; and (b) the restrictive covenant is not reasonably limited.

### a. The Information Is Not Confidential

As set forth in Section C below, the names of, and contact information for, PartyLite's sales force are not secret and were not actively kept confidential. To be protected, the confidential information "must be crystal clear to justify the restraint on the employee, for whom it may have become part of his general knowledge and experience." *Edwards, 2007 WL 2840360* at *2. One seeking to prevent the disclosure or use of [confidential] information must demonstrate that he pursued an active course of conduct designed to inform his employees that such information was to remain confidential. *Jet Spray Cooler, Inc. v. Crampton*, 282 N.E.2d 921, 925 (Mass. 1972).

PartyLite encourages members of its salesforce to market themselves to the public. PartyLite publicizes its salesforce -- and their sales and recruiting successes -- in its monthly Achieve magazine (sent to its high-turnover salesforce – even though many <u>also</u> work for other companies).    This information is also celebrated at PartyLite's annual convention, which is attended, by Consultants and guests.  Further, even though some Leaders did not execute the Leader Agreement, PartyLite did not terminate their access to PartyLite's allegedly confidential/trade secret information.  *(<u>A.3</u> 22:12–23:21, 33:3-13, 35:4–37:2; <u>A.68</u>; <u>A.69</u>).*    PartyLite's disclosures of allegedly confidential information to independent contractors not bound by either restrictive covenant is sufficient evidence, without more, to defeat PartyLite's claim it that may enforce the Non-Solicitation clause against MacMillan to protect that same information which was publicly available.

### b.      The Restrictive Covenants Are Not Limited

Even if the information that PartyLite claims must be protected were confidential (it is not), the Non-Solicitation Clause is not reasonably limited to protect just that information. Indeed, PartyLite's argument for confidentiality casts a bright light on its failure to draft a properly limited restrictive covenant.   In short, PartyLite argues that sales and recruiting statistics are kept confidential because Leaders can access only those statistics that relate to their own downline.   However, the Leader Agreement prohibits Leaders from soliciting <u>anyone</u> associated with PartyLite – not just those in a Leader's own downline. Thus the restraint in the Leader Agreement encompasses much more than just the protection of the alleged "confidential information" PartyLite provided to MacMillan.

### 3.      Non-Solicitation Restriction Is Overbroad And Overlong

A court may choose not to enforce a covenant that has no time or geographic limitation. *See Steelcraft, Inc. v. Mobi Medical, LLC*, No. 081934, 2008 WL 51468979, *2 (Mass. Super. Ct. Nov. 13, 2008). Restrictive covenants containing no limitations as to time or space far exceed the bounds of reasonableness under Massachusetts law *See e.g. Speechworks Intern., Inc. v. Cote*, 2002 WL 31480290, *4 (Mass. Super. Ct. Oct. 11, 2002) ("An unlimited or world-wide area is not acceptable"); *Securitas Security Servs. USA, Inc. v. Jenkins*, No. 032950BLS, 2003 WL 21781385 (Mass. Super. Ct. 2003) (a non-competition agreement must be reasonable in geographical scope and length of time). Likewise, under Florida public policy, restrictive covenants with <u>no</u> time limitations are presumed unreasonable. *See FLA. STAT.* §542.335 (presuming a noncompetition period between 6 months and two years to be reasonable, and to protect trade secrets a restrictive covenants of 5 years is presumed reasonable, while a restraint of more than 10 years is presumed unreasonable). Accordingly, the Non-Solicitation Clause is unenforceable.[9]

4.       **MacMillan Cannot Be Liable For "Indirect" Solicitation**

PartyLite not only seeks breach of contract damages related to the handful of co-workers who talked to MacMillan about her new job, but the Plaintiff seeks to recover "indirect solicitation" damages for the chain reaction that followed. Put another way, if MacMillan solicited A, and then A independently recruited B, PartyLite contends that MacMillan is liable for "indirectly" soliciting B (and then for even more damages when B later recruits C, and so on all the way to Z). The Leader Agreement contains no provision

---

[9] In view of the unlimited and grossly overreaching terms of the Leader Agreement, as well as the manner in which PartyLite attempted to impose it on MacMillan without consideration, this Court should not "save" the overbroad covenants by modifying (blue-penciling) them.

extending damages in such circumstances.   It only prohibits "soliciting, or *otherwise attempting to persuade*" PartyLite's consultants to join another direct sales company.

PartyLite's "indirect" solicitation claim is not allowed under Massachusetts law. Instead, Massachusetts courts have consistently recognized that "solicitation" requires affirmative action by the employee "requesting or seeking to obtain something."  See e.g. *Wolverine Proctor & Schwartz, Inc. v. Aeroglide Corp*., 402 F. Supp.2d 365, 371 (D. Mass. 2005) ("Simply responding to a request for information" is not a solicitation).  In *William Gallagher Assocs. Ins. Brokers, Inc. v. Everts, II*, 2001 WL 1334763, *8-9 (Mass. Super. Ct. Sept. 6, 2001) the court held that certain portions of a non-solicitation clause that provided an employee could not directly or indirectly "call upon, canvass, solicit or approach" customers was too broad to be enforced. The court interpreted the language of the non-solicitation agreement to "envision an active, persuasive undertaking, such as submitting a proposal, negotiation or attempting to provide services. **They do not connote mere contact**."  *Id.* at *8, n. 28.  In *Quaboag Transfer, Inc. v. Halpin*, 2005 WL 937305, *3 (Mass. Super. Ct. Mar. 11, 2005), the court held that even where agreement contained language prohibiting "contact" the court would narrow the scope of the agreement to mean "no solicitation."

Here, MacMillan "actively" pursued, if anyone, only the PartyLite persons whom she spoke to about joining Park Lane.   Accordingly, if this Court finds that the Leader Agreement is enforceable (it is not), then the Non-Solicitation Clause should be limited to MacMillan's <u>actual</u> solicitations and partial summary judgment should be granted in MacMillan's favor with regard to PartyLite's "indirect solicitations" theory.

5.      **No Breach For Disparagement Or Misrepresentation**

Even if the Leader Agreement is enforceable, summary judgment should be entered in MacMillan's favor to the extent any alleged breach is based on MacMillan disparaging and misrepresenting PartyLite's financial condition or the enforceability of PartyLite's contracts. The plain language of the Leader Agreement does not contain a non-disparagement clause or a non-misrepresentation clause.  *(A.18)*. Accordingly, there can be no breach.

## C.  COUNT III:  PARTYLITE'S STATUTORY TRADE SECRET CLAIM.

PartyLite next tries to shoehorn a minor dispute into a statutory trade secrets claim. MacMillan allegedly "misappropriated" a trade secret when she told a handful of salesperson/co-workers (that she already knew well) that she would be leaving.  PartyLite contends that once a Consultant has a friend, relative, or neighbor host a candle party in their home, that person's identity and contact information becomes confidential and a trade secret.

Under Florida law, trade secret misappropriation requires the disclosure or use of a trade secret.  *FLA. STAT. § 688.002*.  Here, MacMillan is entitled to summary judgment on Count III (Misappropriation of Trade Secrets) because MacMillan did not misappropriate anything that arguably could be considered a trade secret.   A trade secret consists of information that derives economic value from: (a) not being generally known to others; (b) not being readily ascertainable by others; and (c) being the subject of reasonable efforts to maintain its secrecy.  *FLA. STAT.* § 688.02; *Nationwide Equip. Co. v. Allen*, 2005 WL 1228360 at *4 (M.D. Fla. May 24, 2005).  Here, as shown below, there is no evidence that PartyLite's alleged trade secrets are not generally known or readily ascertainable.

1.    **The Names And Contact Information Of PartyLite's Salesforce Are Not Trade Secrets.**

PartyLite contends that the names and contact information of its sales force are trade secrets.  (*A.10 113:24–114:3*).  They are not.  How could they be?  PartyLite's business model - - selling candles at "parties" held in neighbors' and friends homes' while recruiting a steady stream of new salespeople -- could not succeed if PartyLite kept the identity and contact information of its sales force secret.  Remembering the names of people you get to know at work is not a statutory violation.  In *Mittenzwei v. Indus. Waste Service, Inc.*, 618 So. 2d 328 (Fla. 3rd DCA1993), a sales person developed client contacts by socializing with various managers and customers. In deciding that customer lists were not trade secrets, the appellate court stated that the former employee "had a long-lasting relationship with the clients she contacted" and did not rely on the compiled list, but rather her relationships.  *Id.* at 329-30; s*ee also American Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998) ("[A]n employer may not preclude its former employee from 'utilizing contacts and expertise gained during his former employment.'").

Indeed, for this very reason, among others, PartyLite's prior attempt to categorize identical information as a trade secret.  *See PartyLite Gifts, Inc. v. Swiss Colony Occasions, No.. 06-cv-170,* 2006 WL 2370338, *6 (E.D. Tenn. 2006), *aff's*, 246 Fed. Appx. 969 (6th Cir. 2007) (PartyLite "quite understandably, does not make any effort to keep the identities of its salespeople a secret since that would interfere with its ability to solicit customers").  In *Swiss Colony,* the district court denied PartyLite's claim for preliminary injunctive relief after finding that the defendant's personal knowledge of certain PartyLite sales people was not a trade secret.  *Id.* at *6.  The Sixth Circuit affirmed the district court's finding on appeal,

relying on the very same facts present in this case – the "apparent widespread distribution" of a PartyLite publication containing "list after list of consultant names, rank in the company, and their sales figures" the "lack of any confidentiality protections" noted on this publication and the "relative ease in locating sales consultants via web searches." *PartyLite Gifts, Inc. v. Swiss Colony Occasions*, 2007 WL 2478582, at *3-4 (6th Cir. 2007).[10]

In *Swiss Colony*, issues of PartyLite's "Reflections" magazines were found on E-Bay. Since that case, PartyLite has renamed its magazine "Achieve" but it still contains the same content, i.e, lists of its top 200 salespersons and top sellers in various other categories (including actual monthly sales figures), names of hometowns of newly qualified Leaders, and lists of top recruiters. There is nothing in the magazine indicating that any of this information is confidential. And there is no prohibition on distributing this magazine at PartyLite parties or to others. **In fact, the February 2010 and January 2011 Achieve magazines were available to the public online.** (*A.39* ¶5-8; *A. 40-43*).

In *Swiss Colony*, an internet web search produced the names of over 300 PartyLite sales consultants and their individual web sites. In "our" lawsuit, a recent internet search produced over 5 million "hits" for PartyLite consultants. (*A.39* ¶10; *A.44*). In addition to individual's web sites, the search returned Facebook and Twitter pages, as well as advertisements for PartyLite shows. (*A.39* ¶10-12). A sampling of that information is included in the Appendix. (*A.45-46*).

Moreover, *Swiss Colony* is not an outlier case. To the contrary, Florida State courts routinely hold that information available to other employees from public sources is not trade

---

[10] Like Tennessee, Florida adopted the Uniform Trade Secrets Act. *See Fla. Stat. § 688.009.*

secret information.  *See Sethscot Collection, Inc. v. Drbul*, 669 So. 2d 1076 (Fla. 3d DCA

1996); *Templeton v. Creative Loafing Tampa, Inc.*, 552 So. 2d 288, 289-90 (Fla. 2d DCA

1989) (finding that information on advertiser and distribution lists not a trade secret where it

could be obtained by looking at past advertisements, newspapers, and the yellow pages and

the employee knew the people on the list on a first name basis as a result of his work); *Nobel*

*Biocare USA, Inc v. Lynch,* No. 99C5774, 1999 WL 958501, *3 (N.D. Ill. Sept. 15, 1999)

(holding names of salespeople was not a trade secret because names of top sellers were

published in the company newsletter and learning which representatives are good performers

can be accomplished through interviewing and other networking measures).  Here, the record

evidence establishes that the names and contact information of members of PartyLite's sales

force are available from public sources or commercially available materials.  *(A.15-17; A.19;*

*A.24; A.26-34; A.41; A.43; A.45; A.46; A.48-55)*.  Moreover, PartyLite does not hide its

successful sales people, but instead, celebrates them in its magazine and at its convention.

*(A.41; A.43)*.

PartyLite cannot have it both ways.  As repeatedly discussed throughout this

memorandum, PartyLite's business model requires that its salespeople are marketers – they

are encouraged to go out in the public, be known and sell, sell, sell.  They have car decals,

purses, clothing, business cards, websites, You Tube videos, and advertisements – all

announcing to the world that they are affiliated with PartyLite.  *(A.6 23:6-14, 104:10-16,*

*105:16-20, 106:21-107:15, 108:21-109:17; A.10 47:16-22)*.  Indeed, PartyLite's Policies and

Procedures encourage the use of social media to promote the business.  Its "advertising"

policy states:  "PartyLite encourages Consultants and Leaders to use social networking sites

such as Facebook, MySpace, Twitter, YouTube, MySpace, Flickr and Yahoo to advertise and network their PartyLite business." *(A. 23 at PLG 1327)*.  It also encourages creating text ads (such as Google adwords) and posting videos on You Tube and other video sites to promote their business.  *(A.23 at PLG 1330)*.

As in *Swiss Colony*, information regarding the identities of salespeople who, as part of their work for PartyLite, hold themselves out to the public and make themselves readily available to the public, is not trade secret information.  Accordingly, MacMillan is entitled to summary judgment on the claim that she misappropriated such information.

### a.  MacMillan's "Scorecard" is not a Trade Secret.

MacMillan also is accused of disclosing a "trade secret" because she gave another person a "scorecard" showing how much money MacMillan earned in 2008 and 2009.  The scorecard identified MacMillan's sales and commissions she earned for that period.  *(A.1 ¶28)*.  It is no different than a lawyer who is looking to join another law firm, identifying the number of billable hours she worked, her client originations, and her collections.  This Leaders Earning Analysis pertains to only MacMillan - - information she herself knew.  It does not disclose what any other person in her downline did in sales or earned – and no such documents like that were given to anyone affiliated with Park Lane.  *(A.11 187:2-188:13, 189:1-17; A.7 6:14-22, 208:3- 209:4)*.  One does not violate "Trade Secret" laws by telling someone else how much money she earned.  As PartyLite readily shared this information with others (A.1. ¶15) PartyLite is hardly compromised if others hear the well-publicized truth that "people at the top" make money from their subordinates' sales.

As the information PartyLite contends was misappropriated is <u>not</u> a trade secret, MacMillan is entitled to summary judgment on Count III.

## D.  COUNT IV:  TORTIOUS INTERFERENCE CLAIM

PartyLite alleges that MacMillan tortiously interfered with its unidentified contractual relationships and business expectancies by, among other things, misappropriating its "trade secrets" and inducing PartyLite salespeople to join Park Lane.  Summary judgment in favor of MacMillan is appropriate because: (1) to the extent this claim is premised on her misappropriation of trade secrets, it is preempted by the FUTSA (FLA. STAT. § 688.001 *et. seq.*); (2) there is no contractual prohibition on PartyLite Consultants working for more than one direct sales company; and (3) there is no evidence of a causal connection between MacMillan's action and any alleged interference between PartyLite and its salespeople.

1.   **PartyLite's Tortious Interference Claim is Preempted by the Uniform Trade Secrets Act.**

FUTSA "displace[s] conflicting tort, restitutory, and other law of this state providing civil remedies for misappropriation of a trade secret." *Fla. Stat. § 688.08*. Thus, as a general proposition other torts involving the same underlying factual allegations as a claim for trade secret misappropriation are preempted by FUTSA.  *New Lenox Indus. v. Fenton*, 510 F. Supp. 2d 893, 908 (M.D. Fla. 2007).  To pursue additional tort causes of action where there are claims for misappropriation of a trade secret, there must be material distinctions between the allegations comprising the additional torts and the allegations supporting the FUTSA claim.  *Id.* citing *Allegiance Healthcare Corp. v. Coleman,* 232 F. Supp. 2d 1329, 1335-36 (S. D. Fla. 2002).  When there is no material distinction, the tort claim is preempted.  *Id.*

PartyLite's tortious interference claim (based on similar facts as in this case) was already rejected in PartyLite's Tennessee lawsuit where the Sixth Circuit Court of Appeals held that PartyLite's tortious interference claim was preempted by Tennessee's version of the Uniform Trade Secrets Act.  The Sixth Circuit said:

> PartyLite consultants are essentially at-will contractors, and they are not forbidden from selling other types of products for other direct sales companies.  Moreover, one element of a tortious interference claim is evidence that the defendant acted maliciously, with an improper motive or means.  PartyLite's argument that [the defendants] acted with improper means is clearly premised upon the alleged trade secrets misappropriation.

*PartyLite v. Swiss Colony Occasions*, 246 Fed.Appx. 969, 975-76 (6th Cir. 2001).  Similarly, the court in the Lewandowski Action held PartyLite's tortious interference claim was preempted.  *(A. 69 Dkt. # 54-1, p. 25)*.

Here, PartyLite's claim for tortious interference consists of allegations that MacMillan interfered with PartyLite's relationships with its independent contractors by misappropriating information about their "secret" identity.  *Dkt. #1 ¶ 75*.  Additionally, PartyLite incorporated the same 58 paragraphs of general factual allegations into its trade secret and tortious interference claims and seeks identical damages.  *Dkt. #1 ¶ 68, 72. (A.2 70:1-25)*.  PartyLite's corporate representative conceded the basis for its tortious interference claim is MacMillan talking with her PartyLite organization about joining Park Lane.   *(A.10 166:25-168:13)*.  It is the "misappropriation" of these same individual's names and contact information that is the basis of PartyLite's trade secret claim.  Thus the claim is preempted.

**2.     There is no viable claim for Tortious Interference with PartyLite's Consultants**

Even if the tortious interference claim is not preempted (it is), MacMillan is entitled to partial summary judgment to the extent the claim seeks relief due to MacMillan's interference with PartyLite's relationship/contracts with its "Consultants."  Indeed, PartyLite admittedly allows Consultants to work for multiple direct sales companies. *(A.3 57:10-25, 58:1-4;  A.10 77:5-13,  79:20-23,  80:21-81:7).*  So, even if PartyLite establishes that MacMillan solicited a PartyLite Consultant to join Park Lane - there is no interference with that Consultant's contract or business relationship PartyLite allows him/her to sell for both companies.

### 3.      MacMillan Did Not Interfere with Those She Never Contacted

As argued in Section B4 above, MacMillan is not liable for indirect solicitations or "interference" with PartyLite's independent contractors.   A cause of action for tortious interference requires that there be direct, intentional inference.  *Rosa v. Florida Coast Bank*, 484 So. 2d 57 (Fla. 4th DCA 1986); *Farah v. Canada,* 740 So.2d 560, 561 (Fla. 5th DCA 1999) ("[A] plaintiff must prove that a third party interfered with a contract by 'influencing, inducing or coercing one of the parties to ... breach the contract ....' ") quoting *West v. Troelstrup,* 367 So.2d 253, 255 (Fla. 1st DCA 1979).

PartyLite must establish that MacMillan's actions were direct and intentional and resulted in the PartyLite salesperson quitting PartyLite to join Park Lane.  *Maaxim Medical Group, Inc. v. Professional Hospital Supply, Inc.*, 2010 WL 2572395 (Bkrtcy.M.D.Fla. March 31, 2010) (no tortious inference where defendant did not "seek out" others).  For the those PartyLite salesperson that MacMillan did not have any contact with, she could not have "induced, influenced, or coerced" those persons to terminate their independent contractor

affiliation with PartyLite.  Accordingly, partial summary judgment is appropriate, as a matter of law, to the extent that PartyLite's claims seek damages for persons MacMillan never contacted.

## E.  MARY GRACE LEWANDOWSKI

As set forth above, PartyLite sued Lewandowski.  The trial court there dismissed with prejudice the breach of contract, tortious interference, and injunctive relief claims asserted by PartyLite.[11]  Now PartyLite is trying to circumvent the Missouri federal court and obtain damages relating to Lewandowski through MacMillan.  Notably, Plaintiff's 30(b)(6) witness testified that as of October 4, 2011, PartyLite's damages calculations in <u>this</u> case did not include Lewandowski.  *(A.10* 157:7-13).  One month later, after the dismissal with prejudice of most of their claims against Lewandowski, PartyLite seeks damages from MacMillan related to Lewandowki's independent actions.   This Court should not allow such gamesmanship.

Additionally, MacMillan did not have any PartyLite confidential information regarding Lewandowski or her downline.  *(A.1 ¶9; A.38 ¶5).*  MacMillan did not solicit Lewandowski or any members of her PartyLite downline.  *(A.1 ¶20; A.38 ¶6-9, 14).*  And there is no evidence that MacMillan worked in concert with Lewandowski, or anyone else, to recruit anyone from Lewandowski's PartyLite downline into Park Lane.  *(A.38 ¶14).*  Accordingly, MacMillan is entitled to partial summary judgment to the extent PartyLite seeks any damages related to Lewandowski or her PartyLite downline.

---

[11] The court allowed PartyLite to more specifically plead its trade secrets claim. *(A.69).*

**F.  INJUNCTIVE RELIEF**

In Count V, PartyLite asserts a claim for "preliminary and permanent injunctive relief" prohibiting MacMillan from "continuing to engage in the conduct described" in the Complaint.  Summary judgment on this claim is appropriate because a claim for injunctive relief is merely a remedy – not a separate cause of action.  *Pierson, III v. Orlando Regional Healthcare Systs., Inc*., 619 F. Supp. 2d 1260, 1289 (M.D. Fla. 2009).

WHEREFORE, MacMillan is entitled to an entry of summary judgment in her favor as to all claims as a matter of law because the complaint, declarations, depositions, and related exhibits do not present disputed issues of material fact.

*/s/ Kimberly J. Gustafson*
Kimberly J. Gustafson
Florida Bar No. 0180890
Trial Counsel
CARLTON FIELDS, P.A.
200 Central Avenue, Suite 2300
St. Petersburg, Florida  33701
Tel:  727-821-7000/Fax:  727-822-3768
Email:  kgustafson@carltonfields.com
*Attorney for Tarie MacMillan*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 2, 2011, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Richard H. Martin, Esq.
AKERMAN SENTERFITT
Sun Trust Financial Centre, Suite 1700
401 E. Jackson Street
Tampa, FL  33602
richard.martin@akerman.com

James Sandnes, Esq.
BOUNDAS, SKARZYNSKI, WALSH
   & BLACK, LLC
One Battery Park Plaza, Floor 32
New York, New York  10004
jsandes@bswb.com

*/s/ Kimberly J. Gustafson*
Kimberly J. Gustafson