# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**PARTYLITE GIFTS, INC.,**

          **Plaintiff,**

vs.                           **Case No. 8:10-CV-1490-T-27EAJ**

**TARIE MACMILLAN,**

          **Defendant.**

_____/

## ORDER

**BEFORE THE COURT** are Defendant's Motion for Summary Judgment (Dkt. 49) and Plaintiff's Motion for Partial Summary Judgment as to Liability for Breach of Contract (Dkt. 51). Upon consideration, Plaintiff's Motion for Partial Summary Judgment as to Liability for Breach of Contract (Dkt. 51) is **DENIED**. Defendant's Motion for Summary Judgment (Dkt. 49) is likewise **DENIED.**[1]

### INTRODUCTION

Plaintiff, PartyLite, Inc. ("**PartyLite**"), filed this action against Defendant, Tarie MacMillan ("**MacMillan**"), alleging claims for breach of contract (Counts I and II), misappropriation of trade secrets (Count III), and tortious interference (Count IV).[2] The claims at issue in the competing summary judgment motions deal primarily with MacMillan's alleged breach of non-compete, non-solicitation, and non-disclosure provisions in agreements between the parties.

---

[1] This Order addresses the parties' cross-motions for summary judgment as to the breach of the Leader Agreement (Count I) and Defendant's Motion for Summary Judgment directed to Count II of the Complaint (*i.e.*, breach of the Consultant Agreement).

[2] Defendant's Motion for Summary Judgment as to Count III (misappropriation of trade secrets) and Count IV (tortious interference) was previously denied. *See* Dkt. 76.

PartyLite moves for summary judgment on Count I of its Complaint (breach of Leader Agreement), contending that the undisputed facts demonstrate that MacMillan breached both the non-compete and non-solicitation provisions in the Leader Agreement.  In response, MacMillan contends that she is entitled to summary judgment on Count I because the Leader Agreement lacks consideration, the restrictive covenants do not protect legitimate business interests, and the covenants are unreasonable in duration and geographic scope.  Additionally, MacMillan argues that she is entitled to summary judgment on Count II because the misconduct in which she is alleged to have engaged is not prohibited by the Consultant Agreement.

## MacMillan's Relationship with PartyLite

PartyLite sells candles and related home products to consumers through the "home party plan" method of direct sales.  "Hosts" conduct sales parties in their homes for "Guests."  Independent contractors known as "Consultants" demonstrate and take orders for PartyLite's products.

All Consultants, including MacMillan, signed a form Consultant Agreement.[3]   The Consultant Agreement governs certain aspects of the relationship between a Consultant and PartyLite. For example, the Consultant Agreement outlines the Consultant's status as an independent contractor, the methods by which a Consultant will sell PartyLite's products, the procedures governing remittance of monies received by a Consultant to PartyLite, and provides that a Consultant will receive some form of compensation for products sold on behalf of PartyLite.

PartyLite argues that the Consultant Agreement also incorporates by reference certain policies and procedures contained in the PartyLite Consultant Guide, Policies & Procedures (the "**Policies**

---

[3] While the parties have apparently been unable to locate the original Consultant Agreement signed by MacMillan, an example of the Consultant Agreement in effect in 1993 is attached to Dkt. 50 as Exhibit 36.

**and Procedures**").[4] If interpreted to include the referenced Policies and Procedures,[5] the Consultant Agreement required that a Consultant agree to certain terms and conditions, including the following:

- Agree you will at all times positively promote and not disparage PartyLite, its products, programs, representatives or personnel.

- Agree not to promote or sell other products or services or recruit for other companies or other business activities at PartyLite Shows, meetings or other events.

- Agree that should you represent another company or participate in other business activities outside PartyLite, that any information, printed materials or other items obtained through your association with PartyLite be kept separate and not used to solicit, promote, market or sell at or for any non-PartyLite activity.   Any use of PartyLite information to promote non-PartyLite business activities constitutes "unfair business practice" which is legally actionable.

- Agree to keep PartyLite information confidential.

Policies and Procedures (Dkt. 54), p. 59.  The Policies and Procedures also defined confidential information to include personal and financial details about hosts, guests, Consultants, and leaders and provided:

> Note: All information on PartyLite's Websites or on Websites hosted by PartyLite is confidential and proprietary to PartyLite.  This information, such as consultant, Hostess, Guest and Leader

---

[4] A copy of a document entitled "Policies and Procedures" and effective in or about 2008 is attached as Exhibit A-59 to the Declaration of James Sandness (Dkt. 53 as amended by Dkt. 54) filed in support of PartyLite's motion for summary judgment.  A *different* version of what purports to be the *same* document is attached as Exhibit B to the Complaint.  The document containing the "policies and procedures" that PartyLite relies on to support its claim that MacMillan breached the Consultant Agreement is variously referred to as the Consultant Guide, PartyLite's Policies and Procedures, and the Consultant Business Guide.

[5] While MacMillan does not deny having signed a Consultant Agreement, the parties dispute the content and scope of the agreement.  For the reasons discussed below, however, whether the Consultant Agreement incorporates by reference all of PartyLite's policies and procedures is not ripe for resolution on summary judgment and, in any event, is largely irrelevant to the issues of liability and damages because MacMillan expressly agreed to the policies and procedures when she signed the Leader Agreement.

> information, must not be disclosed to any third party or used by you
> for any reason except for PartyLite Business.

Policies and Procedures (Dkt. 53-8), p. 21; *see also* Policies and Procedures (Dkt. 54), p. 77.

According to certain documents apart from the Consultant Agreement, including the Policies

and Procedures and the PartyLite Profit Program, a Consultant may become a "Unit Leader" by

achieving certain sales levels and recruiting new Consultants. Unit Leaders earn commissions from

their own sales as well as "downline" sales by Consultants the Leader recruited. A Unit Leader may

become a high-level "Leader" if downline sales and recruitment meet certain goals.

MacMillan qualified for the role of Unit Leader in or about July 1993. She eventually

advanced to the highest-level "Leader" recognized by PartyLite, specifically that of "Senior Regional

Vice President."[6]

On or about June 19, 2006, after her promotion to "Senior Regional Vice President," PartyLite

and MacMillan entered into a Leader Commitment Agreement (the **"Leader Agreement"**). The

Leader agreement expounded on the terms of the Consultant Agreement and included the following

relevant provisions:

### Use of Proprietary and Confidential Information

> I agree that, during the term of this Agreement and thereafter, I shall
> not use, or provide others, any Company proprietary or confidential
> information in any form (including, but not limited to, customer
> information, financial information or contact information regarding
> other Leaders or Consultants, as well as, Hostesses and Guests) to
> adversely affect the Company or to benefit any other company or
> myself. I further agree that, during the term of this Agreement and
> after the term ends and thereafter, *I shall not solicit or otherwise*
> *attempt to persuade any PartyLite Consultant or Leader to sell, resell*

---

[6] Despite having the title of "Senior Regional Vice President," MacMillan's status with respect to PartyLite remained that of an independent contractor.

4

> *or promote products of any other direct sales company, or to cease to be a Consultant or Leader of the Company.* (emphasis added)

*****

**Conflict of Interest**

> The Company and I acknowledge and agree that my efforts as a Leader may not require my full business time. During the term of this Agreement I may accept employment or other engagements and may participate in other activities without obtaining the Company's approval thereof; provided, however, that such employment, other engagements and activities do not violate this Agreement and do not involve selling, reselling, promoting products, or actively representing other direct sales companies that are *similar to or competitive with the Company*. This does not include affiliation with other direct sales companies for personal use and/or consumption. I agree that the Company, at its discretion, can choose to terminate this Agreement immediately if I engage in any of the aforementioned activities. (emphasis added)

Leader Agreement, ¶¶ 8, 10 (Dkt. 53-1).[7] MacMillan worked as a Leader for PartyLite for several years after executing the Leader Agreement and before engaging in the conduct that gave rise to this litigation.

### MacMILLAN'S CONDUCT AT ISSUE IN THIS LITIGATION

In or about 2010, MacMillan joined the sales force of Park Lane Jewelry, Inc. ("**Park Lane**"), another direct sales company. Park Lane sells jewelry through a "home party plan" method of direct sales, similar to that employed by PartyLite. While there are differences between the organizational and compensation structures of Park Lane and PartyLite, and their products are dissimilar, it is undisputed that both entities are engaged in direct sales to consumers through a

---

[7] The Consultant Agreement remained in full force and effect despite the formation of the Leader Agreement. In addition, by signing the Leader Agreement, MacMillan expressly agreed to be bound by the Party Lite's "policies and procedures," including those contained in the "Consultant Business Guide." *See* Leader Agreement (Dkt. 53-1), p. 1.

process known as multi-level marketing and rely primarily on "parties" arranged by their "consultants" or "hostesses" to sell their products.

While the inferences to be drawn from the facts giving rise to this litigation are disputed, many of the facts relating to MacMillan's departure from PartyLite are undisputed. For example, it is undisputed that MacMillan had contact with Park Lane representatives on numerous occasions before her relationship with PartyLite ended. Significantly, it is undisputed that prior to and after her departure from PartyLite, MacMillan had numerous meetings with PartyLite salespersons both inside and outside the State of Florida during which MacMillan discussed her reasons for joining ParkLane. At these meetings, MacMillan offered to refer anyone interested in joining Park Lane to a high-level Park Lane official, usually Park Lane National Director Shannon Pell. In most cases, Ms. Pell was conveniently available to meet with interested individuals almost immediately and irrespective of location. Similarly, there is undisputed evidence demonstrating that at least some of the individuals with whom MacMillan met left PartyLite and went to work for Park Lane shortly after meeting with MacMillan.

Additionally, PartyLite has submitted evidence, by affidavit and otherwise, indicating that MacMillan made false or misleading statements about PartyLite, its financial condition, and the enforceability of the restrictive covenants at issue in this litigation.

<u>**STANDARD ON SUMMARY JUDGMENT**</u>

Summary judgment is proper if, following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c). "An issue of fact is 'material' if, under the

applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323-24. The evidence must be significantly probative to support the claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The Court will not weigh the evidence or make findings of fact. *Anderson*, 477 U.S. at 249; *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable jury could find for the non-moving party. *Id.*

<u>DISCUSSION</u>

In order to recover for breach of contract, PartyLite must prove by a preponderance of the evidence: (1) the existence of a valid contract; (2) that PartyLite fulfilled its obligations under the contract; (3) a breach by MacMillan; and (4) damages. *See Michelson v. Digital Fin. Servs.*, 167 F.3d 715, 720 (1st Cir. 1999) (applying Massachusetts law); *Coll v. PB Diagnostics Sys., Inc.*,

50 F.3d 1115, 1122 (1st Cir. 1995) (applying Massachusetts law); *see also Rollins, Inc. v. Butland*, 951 So.2d 860, 876 (Fla. 2nd DCA 2006).[8]

### Breach of the Leader Agreement (Count I)

PartyLite contends it is entitled to summary judgment on its claims that MacMillan breached the Leader Agreement by (1) joining Park Lane's sales force while she was still associated with PartyLite and (2) recruiting PartyLite's salespeople to join Park Lane's sales force during the time that MacMillan remained associated with PartyLite.

Conversely, MacMillan argues that she is entitled to summary judgment because (1) the Leader Agreement was not supported by consideration, (2) there is no legitimate business interest supporting the restrictive covenants, (3) the restrictive covenant is not reasonably limited to protect the alleged confidential information, and goodwill among the sales force is not a legitimate interest, and (4) the Court should not "blue pencil" the non-solicitation clause to make it enforceable. MacMillan argues that at a minimum, disputed issues of material fact exist as to whether MacMillan violated the restrictive covenants in the Leader Agreement.

Before addressing whether the undisputed facts demonstrate that MacMillan breached the Leader Agreement, her contentions that the agreement is void or voidable will be addressed.

### *Adequacy of Consideration*

For a non-compete or similar restrictive covenant to be enforceable under Massachusetts law, it must be supported by consideration. *Marine Contractors v. Hurley*, 310 N.E.2d 915, 918 (Mass. 1974). Any additional benefit provided to the employee constitutes consideration in this context.

---

[8] The Leader Agreement provides that it shall be governed by Massachusetts law. In contrast, the Consultant Agreement includes no choice-of-law provision. For purposes of summary judgment, however, any differences between Massachusetts and Florida relating to the elements of a breach of contract claim are immaterial.

8

*Bowne of Boston, Inc. v. Levine*, 1997 WL 781444 at * 4 (Mass. Super. Ct., No. CIV. A. 97-5789A, Nov. 25, 1997).

The Leader Agreement provides:

> I wish to participate in the PartyLite Gifts, Inc. (the "Company") Profit Plus Program (the "Program") as a Leader[]. I understand that in order to participate in the Program, I must continue to comply with my Consultant Agreement and personally sell products of the Company. Upon acceptance of this Leader Commitment Agreement (this "Agreement") by the Company by an authorized signature and in consideration of the Company's granting me the right and privilege in the Program, I agree to the following terms and conditions. The Company, in turn, reaffirms its commitment to supporting Leaders and Consultants by providing quality products and a Leader program that offers unlimited personal and professional growth opportunities.

Leader Agreement (Dkt. 53-1), p.1. On its face, the Leader Agreement expressly provides that MacMillan's ability to continue to participate in the Profit Plus Program as a Leader was the consideration supporting the Leader Agreement.

Despite this language, MacMillan argues that the Leader Agreement fails for lack of consideration under Massachusetts law. Specifically, MacMillan argues that continued employment (or, presumably, the continued ability to participate in the Profit Plus Program) does not qualify as adequate consideration under Massachusetts law. During oral argument, however, counsel for MacMillan acknowledged that she could point to no case from the Supreme Judicial Court of Massachusetts supporting this contention. Rather, she relied primarily on a federal district court decision purporting to interpret Massachusetts law. *See IKON Office Solutions, Inc. v. Belanger*, 59 F.Supp.2d 125, 130-32 (D. Mass. 1999) (expressing doubt about adequacy of continued employment as sole consideration for post-employment non-competition agreement under current Massachusetts law).

The holding in *IKON* has been met with disapproval by at least one Massachusetts lower court, which cited Massachusetts precedent supporting its conclusion that the circumstances in *IKON* "do not abolish the doctrine that continued employment may suffice to support such covenants." *EMC Corp. v. Donatelli*, 25 Mass. L. Rep. 399, 2009 Mass. Super. LEXIS 120, at *17 (Mass. Super. Ct. May 4, 2009) ("However, to the extent that *IKON* stands for the proposition that, on the facts of that case, mere continuation of defendant's existing employment was not sufficient, the Court concludes that IKON does not reflect current Massachusetts law.").[9]

Various decisions by Massachusetts courts hold that a promise of continued employment constitutes consideration supporting a restrictive covenant entered into after one has been employed. *Inner-Tite Corp. v. Brozowski*, 2010 WL 3038330, 16 (Mass. Super. Ct. 2010) ("Continued employment is sufficient consideration to support a non-compete agreement in Massachusetts.") (citing *Horner v. Boston Edison Co.*, 695 N.E.2d 1093, 1096 (Mass. App. Ct. 1998)); *Economy Grocery Stores Corp. v. McMenamy*, 195 N.E. 747, 748 (Mass. 1935) (restrictive covenant executed after commencement of employment not void for lack of consideration because when accepted and acted on by plaintiff, it implied a promise on the part of plaintiff to employ defendant); *Sherman v. Pfefferkorn*, 135 N.E. 568, 569 (Mass. 1922) (same); *Wilkinson v. QCC, Inc.,* 759 N.E.2d 1232, 2001 WL 1646491, at *1 (Mass. App. Ct. Dec. 21, 2001) (unpublished opinion) ("To the extent new consideration was required [to support a non-competition agreement 'imposed on' plaintiff when he

---

[9] The Tenth Circuit recently recognized that "Massachusetts courts have been less than clear on the issue of consideration for non-compete agreements formed post-employment." *Boston Scientific Corp. v. Mikelle Mabey*, 455 Fed. Appx. 803, 805 (10th Cir. 2011) (citing cases). Nonetheless, this Court finds the reasoning of the Tenth Circuit in *Boston Scientific* persuasive and concludes, consistent with precedent from the Supreme Judicial Court of Massachusetts and lower Massachusetts courts, that under Massachusetts law, a non-compete agreement or similar restrictive covenant supported only by continued employment is not void for lack of consideration. *Id.* (citing *Sherman v. Pfefferkorn*, 135 N.E. 568, 569 (Mass. 1922)).

was already employed], continued employment was the consideration."). *But cf. Tyler Techs., Inc., v. Reidy*, Civil No.2006-4404, 2006 WL 4119598, at *3 (Mass. Super. Ct. Oct. 30, 2006) (questioning adequacy of consideration where defendant was already an employee when agreement was signed).

Considering these cases, the Leader Agreement is neither void nor voidable due to lack of consideration under Massachusetts law, notwithstanding that MacMillan signed the Leader Agreement after she had been promoted to Leader. *Cf. Coastal Unilube, Inc. v. Smith*, 598 So.2d 200, 201-02 (Fla. 4th DCA 1992) (continued employment is adequate consideration to support covenant not to compete where agreement expressly identified continued employment as consideration). This conclusion is bolstered by the fact that PartyLite could have altered MacMillan's compensation and terminated her position with PartyLite at will and upon reasonable notice.[10] PartyLite's promise to continue to retain MacMillan as a Leader and compensate her under the Profit Plus Program as a Leader constituted sufficient consideration under Massachusetts law. Accordingly, MacMillan's summary judgment motion advancing a contrary conclusion is denied.

### *Enforcement of Restrictive Covenants*

---

[10] Indeed, MacMillan's argument attempting to limit the scope of the Consultant Agreement strongly suggests that the Leader Agreement imposed new obligations on MacMillan in return for a contractual right to receive the increased compensation offered by PartyLite pursuant to the Profit Plus Award Program. For example, the Consultant Agreement on its face makes no reference to MacMillan's purported entitlement to commissions on sales made by other Consultants. Moreover, the fact that other PartyLite Leaders may not have signed the Leader Agreement, but rather were deemed by PartyLite to have agreed to its terms by continuing to accept compensation from PartyLite, is irrelevant to whether MacMillan is bound by an agreement she executed. The undisputed facts demonstrate that MacMillan voluntarily signed the Leader Agreement and continued to accept the benefits of the Profit Plus Award Program for several years before leaving PartyLite to work with Park Lane.

11

Section 542.335(1), Florida Statutes,[11] permits the enforcement of contracts restricting or prohibiting competition during or after the term of the restrictive covenant so long as the contracts are reasonable in time, area, and line of business. A party seeking to enforce a restrictive covenant must plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant and that the restriction is reasonably necessary to protect those legitimate business interests. Fla. Stat. § 542.335(1)(b) and (c).[12] If the party seeking enforcement of the restrictive covenant establishes a *prima facie* case, the party opposing enforcement has the burden of establishing that the contractually specified restraint is overbroad, overlong, or otherwise not reasonably necessary to protect the established legitimate business interests. Fla. Stat. § 542.335(1)(c); *North Am. Prods. Corp. v. Moore*, 196 F.Supp.2d 1217, 1228 (M.D. Fla. 2002).

---

[11] As previously indicated, the Leader Agreement provides that it shall be governed by Massachusetts law. In contrast, the Consultant Agreement contains no choice-of-law provision. The parties dispute whether Massachusetts or Florida law should be applied to determine the enforceability of the restrictive covenants in the Leader Agreement. To the extent there is no true conflict between Massachusetts and Florida law, the Court will generally apply Florida contract law. *See Fioretti v. Massachusetts General Life Ins. Co.*, 53 F.3d 1228, 1234 n.21 (11th Cir. 1995) (holding that in cases of a "false conflict" of law, a court may apply the law of the forum state). In circumstances when a conflict may exist (or citation to the law of both states is otherwise appropriate), the Court will refer to both Florida and Massachusetts law.

[12] Massachusetts courts have referred to Section 515 of the Restatement (First) of Contracts and Section 188 of the Restatement (Second) of Contracts when discussing the enforceability restrictive covenants. Section 188 provides:

> (1) A promise to refrain from competition that imposes a restraint that is ancillary to an otherwise valid transaction or relationship is unreasonably in restraint of trade if
>
> > (a) the restraint is greater than is needed to protect the promisee's legitimate interest, or
> >
> > (b) the promisee's need is outweighed by the hardship to the promisor and the likely injury to the public.
>
> (2) Promises imposing restraints that are ancillary to a valid transaction or relationship include the following:
>
> > *****
> >
> > (b) a promise by an employee or other agent not to compete with his employer or other principal; ... .

*Legitimate Business Interest*

Under both Florida and Massachusetts law, PartyLite must identify one or more legitimate business interests that justify enforcement of the restrictive covenants. *Marine Contractors Co. v. Hurley*, 310 N.E.2d 915, 920 (Mass. 1974); *accord* Fla. Stat. § 542.335(1)(b) and (c).  Generally, legitimate business interests include trade secrets, valuable confidential business or professional information that otherwise does not qualify as trade secrets, substantial relationships with specific prospective or existing customers or clients, customer or client goodwill associated with a specific geographic location or specific marketing or trade area, and extraordinary or specialized training. *See* Fla. Stat. § 542.335(1)(b); *see also Marine Contractors Co.*, 310 N.E.2d at 920 ("legitimate business interests might include trade secrets, other confidential information, or ... the good will the employer has acquired through dealings with his customers"). "Protection of the employer from ordinary competition, however, is not a legitimate business interest, and a covenant not to compete designed solely for that purpose will not be enforced." *Id.* (citing *Richmond Bros., Inc. v. Westinghouse Bdcst. Co. Inc.*, 256 N.E.2d 304, 307 (Mass. 1970)); *accord Bowne of Boston, Inc. v. Levine*, 1997 WL 781444 at * 2 (Mass.Super. Ct., No. CIV. A.97-5789A, Nov. 25,1997).

Significantly, Massachusetts courts enforce restrictive covenants prohibiting former employees from soliciting their former employer's employees, often referred to as anti-raiding covenants, so long as the covenant is reasonable in scope. *See Filmore & Stern, Inc. v. Frankel*, No. 020821, 2002 WL 31678307 at * 1-2 (Mass.Super. Ct. Sept. 17, 2002) (enjoining former employee from soliciting for employment or hire any of former employer's employees); *Modis, Inc.*

*v. Revolution Group, Ltd.*, No. 99- 1104, 1999 WL 1441918, at * 8 (Mass.Super. Ct., Dec. 29, 1999)(upholding two year anti-raiding covenant against former employee).[13]

Implicit in these holdings is a recognition that an employer's relationship with its employees is a legitimate business interest which may be protected by a reasonable anti-raiding covenant. For purposes of the instant motions, this Court discerns no distinction between employees and PartyLite's Consultants and Leaders. Certainly, consistent with Massachusetts' law, PartyLite had a legitimate business interest in protecting its relationship with its Consultants and Leaders, through whom PartyLite sold its products and generated sales revenue. Indeed, Massachusetts courts recognize that an employer has a legitimate business purpose in restricting former employees from soliciting and hiring the employer's employees, premised on the employer's concern about "future success" and protecting itself against "loss or misuse of its employees." *Quaboag Transfer, Inc. v. Halpin*, Nos. CIV. A. 02-0868A, CIV A. 02-0869A, 2005 WL 937305 at * 3 (Mass.Super. Ct., Mar. 22, 2005) (defining "solicit" as denoting "more than simple contact," consisting of "an attempt to obtain something by persuasion, or to ask for the purpose of receiving."). Accordingly, MacMillan's summary judgment advancing a contrary conclusion is denied.

### Scope of Restrictive Covenants

PartyLite must also demonstrate that the restrictive covenants are reasonably necessary to protect its legitimate business interests. Fla. Stat. § 542.335(1)(b) and (c); *see also Boulanger v. Dunkin' Donuts Inc.*, 815 N.E.2d 572, 576-77 (Mass. 2004) ("A covenant not to compete is

---

[13] Similarly, Florida courts recognize that an employer's relationship with its employees constitutes a legitimate business interest. *Balasco v. Gulf Auto Holding, Inc.*, 707 So.2d 858, 860 (Fla. 2d DCA 1998) (holding that agreement prohibiting sales manager from soliciting or influencing other employees to leave automobile dealership for two years following his resignation was presumptively reasonable and necessary to protect substantial investment dealership made in specialized training of its sales staff and furthered legitimate business interests of promoting productivity and maintaining competent and specialized sale team, and thus, was enforceable).

enforceable only if it is necessary to protect a legitimate business interest, reasonably limited in time and space, and consonant with the public interest."). And a restrictive covenant must be reasonable in geographical scope and length of time to be enforceable. *Speechworks Intern., Inc. v. Cote*, No. 024411BLS, 2002 WL 31480290, 4 (Mass.Super. Ct. Oct. 11, 2002); *Inner-Tite Corp. v. Brozowski*, No. 20100156, 2010 WL 3038330 at * 18 (Mass.Super. Ct. Apr. 14, 2010).

"In determining whether a covenant will be enforced, in whole or in part, the reasonable needs of the former employer for protection against harmful conduct of the former employee must be weighed against both the reasonableness of the restraint imposed on the former employee and the public interest." *All Stainless, Inc. v. Colby*, 308 N.E.2d 481, 485 (Mass. 1974) (citations omitted). "If the covenant is too broad in time, in space or in any other respect, it will be enforced only to the extent that is reasonable and to the extent that it is severable for the purposes of enforcement." *Id.* (citations omitted); *see Cedric G. Chase Photographic Labs, Inc. v. Hennessey*, 97 N.E.2d 397, 398 (Mass. 1951); *see also* Fla. Stat. § 542.335(1)(j).

Whether a non-compete covenant is reasonable or overbroad is a question of fact, not of law. *See MDS (Canada), Inc. v. Rad Source Technologies, Inc.*, 822 F.Supp.2d 1263, 1313 (S.D. Fla. 2011); *Orkin Exterminating Co. v. Girardeau*, 301 So.2d 38, 40 (Fla. 1st DCA 1974), *cert. denied*, 317 So.2d 75 (Fla. 1975) (recognizing that "[w]hat is a reasonable area is a factual matter to be determined in each [non-compete] case"); *Sarasota Beverage Co. v. Johnson*, 551 So.2d 503, 507 (Fla. 2d DCA 1989) (citing *Dorminy v. Frank B. Hall Co., Inc.*, 464 So.2d 154 (Fla. 5th DCA 1985)) (concluding that "[t]he facts of each [non-compete] case determine whether the area and time restrictions are reasonable").

15

**Non-Compete Covenant**

The non-compete clause in the Leader Agreement is expressly limited to "selling, reselling, promoting products, or actively representing other direct sales companies that are *similar to or competitive with* the Company" during the term of the Leader Agreement.[14]   MacMillan cannot reasonably challenge the scope or duration of this restrictive covenant to the extent it applies only to competing companies and is limited in duration to the time when she was associated with PartyLite (*i.e.*, prior to the termination date of the Leader Agreement).[15]   The non-compete provision is also reasonable in geographic scope to the extent it is construed to   prohibit MacMillan from competing with PartyLite only in North America.[16]

**Non-Solicitation Covenant**

In contrast to the limited scope of the non-compete provision, the non-solicitation clause in the Leader Agreement lacks any restriction on its duration or geographic scope, but rather provides

---

[14] To the extent MacMillan contends that Park Lane is not "a company similar to or competitive with" PartyLite, this argument is addressed below in connection with the issue of whether there is evidence demonstrating that MacMillan breached the non-compete provision. This issue, however, may also be relevant to the reasonableness of the restrictive covenant to the extent a broad interpretation of this provision might preclude MacMillan from obtaining gainful employment with any company engaged in the direct sales industry.

[15] The Leader Agreement provides that "[e]ither party may terminate this Agreement on 10 days written notice." There is no dispute that MacMillan never sent formal notice to PartyLite of her intention to terminate the Leader Agreement. In contrast, PartyLite provided notice of its intention to terminate MacMillan's relationship with the company by letter dated June 25, 2010. *See* Termination Letter (Dkt. 53-2). Assuming, as MacMillan apparently concedes, that this letter constituted the notice of termination contemplated by the Leader Agreement, the effective termination date of the Leader Agreement was July 5, 2012.

[16] It is undisputed that MacMillan appeared at PartyLite events and promoted PartyLite throughout North America. In this regard, a nationwide covenant not to compete is not invalid *per se*, since "the area in which competition is to be restricted must not be broader than is necessary to protect the employer's interests." *See Auto Club Affiliates, Inc. v. Donahey*, 281 So.2d 239, 241-43 (Fla. 2d DCA 1973) (holding nationwide restriction on employee's entering into competition with employer upon termination of employment did not appear unreasonable); *see also Autonation, Inc. v. O'Brien*, 347 F.Supp.2d 1299, 1307-08 (S.D. Fla.2004) (finding reasonable geographic restriction preventing employee from "working in any geographic space in which [employer] operates" where employer had interest in confidential information); *Advanced Cable Ties, Inc. v. Hewes*, No. 061995B, 2006 WL 3292810, at *1-2 (Mass. Super. Ct. Oct. 19, 2006) (lack of geographic scope restriction in non-compete not fatal to enforcement of restrictive covenant when employer was national company).

16

that "during the term of this Agreement and thereafter, I shall not use, or provide others, any Company proprietary or confidential information in any form ... [and], I shall not solicit or otherwise attempt to persuade any PartyLite Consultant or Leader to sell, resell or promote products of any other direct sales company, or to cease to be a Consultant or Leader of the Company."

Certainly, an indefinite non-solicitation provision is presumptively unreasonable. Fla. Stat. § 542.335; *Speechworks Intern., Inc. v. Cote, supra* (restrictive covenant with no geographic limitation unacceptable). Notwithstanding, that the Leader Agreement places no temporal duration on this covenant does not render it unenforceable. The Court has the discretion to enforce it to the extent it is found reasonable and necessary to protect one or more legitimate business interests.

Where, as here, the provisions of a restrictive covenant are unreasonable, the correct procedure is for the Court to modify, or "blue pencil," the agreement and award an appropriate remedy. Fla. Stat. § 542.335(c) ("If a contractually specified restraint is overbroad, overlong, or otherwise not necessary to protect the legitimate business interest or interests, a court *shall* modify the restraint and grant only the relief necessary to protect such interest or interests) (emphasis added); *L.G. Balfour Co., Inc. v. McGinnis*, 759 F.Supp. 840, 845 (D. D.C. 1991) (applying Massachusetts law) (citing *All Stainless, Inc.*, 308 N.E.2d at 485; *New England Tree Expert Co., Inc. v. Russell*, 28 N.E.2d 997, 999-1000 (Mass. 1940)).[17]

In Florida, a six month restraint on trade is presumed reasonable when enforced against a former employee and reasonably necessary to protect a legitimate business interest. *See* Fla. Stat.

_____

[17] *See Miller Mech., Inc. v. Ruth*, 300 So.2d 11, 12-13 (Fla. 1974) (citing *Kenco Chem. and Manufacturing Co. v. Railey*, 286 So.2d 272 (Fla. 1st DCA 1973)); *Flickenger v. R.J. Fitzgerald & Co., Inc.*, 732 So.2d 33, 35 (Fla. 2d DCA 1999); *Balasco v. Gulf Holding, Inc.*, 707 So.2d 858, 860 (Fla. 2d DCA 1998); *see also Health Care Financial Enterprises, Inc. v. Levy*, 715 So.2d 341, 343 (Fla. 4th DCA 1998) (holding that court may not refuse to enforce noncompete agreement solely because geographical area is unreasonable, but rather must modify unreasonable restriction and enforce agreement as modified).

§ 542.335(1)(d). While Massachusetts law lacks a similar statute establishing the presumptive reasonableness of a restrictive covenant, it is likely that a six month restraint on trade would likewise be construed as reasonable under Massachusetts law. *See Emptoris, Inc v. Opera Solutions, LLC*, 26 Mass. L. Rep. 461, 2009 WL 5909264, at *3 (Mass. Super. Ct. Dec. 9, 2009) (noting that Massachusetts courts have previously accepted a duration of two years as a reasonable scope for covenants not to compete) (citing *All Stainless, Inc.*, 308 N.E.2d at 485-86).        Accordingly, it is likely that the non-solicitation provision in the Leader Agreement is enforceable, but only for a period of six months after the termination of MacMillan's relationship with PartyLite. Regardless, however, MacMillan's recruiting efforts on behalf of Park Lane, albeit disputed, occurred while MacMillan was still under contract with PartyLite. Certainly, a non-solicitation covenant restricting recruiting activities during one's employment is reasonable and therefore enforceable.

MacMillan's argument that the scope of the non-solicitation provision is overbroad because it precludes MacMillan from soliciting PartyLite Consultants that were not within her direct chain (*i.e.*, Consultants as to which MacMillan presumably lacked any confidential information), is unpersuasive. From a legitimate business interest perspective, this Court sees no distinction between Consultants, whether they be in or out of MacMillan's direct chain.        Moreover, there is case law supporting, by analogy, PartyLite's right to enforce this non-solicitation provision to preclude MacMillan from soliciting any PartyLite Consultant. *See also Supinski v. Omni Healthcare, P.A.*, 853 So.2d 526, 530-31 (Fla. 5th DCA 2003) (holding that "injunction prohibiting doctor from seeing any patients from medical practice that formerly employed him, as provided for in covenant not to compete, was not overbroad, and should not have been limited to only those patients he treated while employed by practice"); *cf. Milner Voice and Data, Inc. v. Tassy*, 377

18

F.Supp.2d 1209, 1218 (S.D. Fla. 2005) (noting under Florida law, "to have protectable interest in specific prospective or existing customer relationships," employer seeking to enforce restrictive covenant in employment agreement need not prove that its former employee himself had a substantial relationship with any particular customer). *But cf. All Stainless, Inc.*, 308 N.E.2d at 487 (noting that Massachusetts cases have generally limited the enforcement of restrictive covenant to only bar sales to customers formerly solicited by the salesperson or to whom sales were in fact made by the salesperson).

The Court therefore finds that the non-solicitation and non-compete covenants in the Leader Agreement are enforceable. MacMillan's summary judgment motion is therefore denied in this respect.

### Breach of the Non-Compete Provision in the Leader Agreement

MacMillan contends that even if the non-compete provision is enforceable, she is entitled to summary judgment. Specifically, MacMillan argues that there was no breach of the non-compete clause because (1) Park Lane is not "similar to or competitive with" PartyLite and (2) MacMillan never (simultaneously) sold products for both companies. In support of this position, MacMillan points out that Park Lane and PartyLite sell different products. MacMillan argues that if the language limiting the scope of the non-compete covenant "other direct sales companies" is to have any meaning, the "similar to or competitive with" qualifier must be read to require the "other" company to sell goods or services that are "similar to or competitive with" PartyLite. MacMillan contends that because PartyLite sells candles and Park Lane sells jewelry, the two companies are not similar or in competition.

19

MacMillan's interpretation of the restrictive covenant, however, ignores the fact that there are different types of direct sales companies (*e.g.*, door-to-door sales vs. home party sales) and that the "similar to or competitive with" language can be read to refer to the method of direct sales as opposed, or in addition, to the products being sold.   In this regard, as the undisputed facts demonstrate, PartyLite and Park Lane are competitors in that they compete for salespeople by offering competitive income opportunities under similar, albeit not identical, compensation schemes.

Additionally, PartyLite and Park Lane are similar in that they both use the home party method of direct sales to market their products.   That the companies may sell different products does not mandate the conclusion that they are neither similar nor competitive. *See American Standard, Inc. v. Humphrey*, No. 3:06-cv-893-J-32MCR, 2007 WL 2852362, at *3 (M.D. Fla. Oct. 2, 2007) (recognizing that, "like any market participant, Plaintiff likely has some legitimate interests tied up in managers ..." that would support submitting issue of fact as to whether companies were engaged in the same or similar business even if new employer was not a direct competitor of former employer); *IONA Techs., Inc. v. Walmsley*, No. 021442, 2002 WL 1290217, at *4 (Mass. Super. Ct. Apr. 29, 2002) ("using an analysis focused on the customer and to whom product is marketed in determining the meaning of 'direct competition'," the court noted in *dicta* that companies were competitors even though the competition was only at margins and "in a very small portion of [the plaintiff's] product lines"); *cf. Lombard Med. Tech., Inc. v. Johannessen*, 729 F.Supp.2d 432, 440 (D. Mass. 2010) (noting that "companies are in direct competition not because they manufacture

identical products, but because a consumer would turn only to one of these entities' products to solve its problems").[18]

Finally, MacMillan's contention that she did not breach the non-compete provision because she did not simultaneously sell products for both PartyLite and Park Lane ignores the language of the non-compete provision which barred MacMillan from "promoting products, or actively representing other direct sales companies" while she was associated with PartyLite. In this regard, there is certainly sufficient evidence in the record from which a reasonable juror could conclude that MacMillan "promoted" or "actively represented" Park Lane prior to the termination of her relationship with Party Lite. At a minimum, disputed issues of material fact preclude summary judgment on the issue of whether MacMillan breached this aspect of the non-compete provision in the Leader Agreement.

### Breach of Non-Solicitation Clause in the Leader Agreement

MacMillan argues that, at a minimum, factual issues exist as to whether there was a breach of the non-solicitation clause in the Leader Agreement because (1) under Massachusetts law merely telling someone your reason for leaving an employer is not solicitation, (2) the "otherwise attempt to persuade" language in the non-solicitation clause is ambiguous and does not expand the

---

[18] Under Florida law, courts are required to construe restrictive covenants "in favor of providing reasonable protection to all legitimate business interests established by the person seeking enforcement" and are prevented from employing "any rule of contract construction requiring the construing a restrictive covenant narrowly against the restraint or against the drafter where legitimate business interests have been established." Fla. Stat. § 542.335(1)(h). In contrast, under Massachusetts law, a restrictive covenant in an employment contract, particularly an employment contract drafted by the employer, is strictly construed against the employer. *See Sentry Ins. v. Firnstein*, 442 N.E.2d 46, 46-47 (Mass. App. Ct. 1982) (citing Restatement (Second) of Contracts § 188, comment *g*).

non-solicitation restriction to MacMillan's actions, (3) and factual issues exist as to whether MacMillan solicited those individuals that joined Park Lane.[19]

MacMillan's suggestion that she did not solicit PartyLite Consultants to go to work for Park Lane is based on a strained interpretation of the definition of solicitation and Massachusetts case law.[20] MacMillan's argument rests on the definition of "solicitation" as "the act or an instance of requesting or seeking something; a request or petition," and the recognition by Massachusetts courts that "simply responding to a request for information does not constitute solicitation." *See Wolverine Proctor & Schwartz, Inc. v. Aeroglide Corp.*, 402 F.Supp.2d 365, 371 (D. Mass. 2005) (citing *Oceanair, Inc. v. Katzman*, 14 Mass. L. Rep. 414, 2002 WL 532475, at *6 (Mass. Super. Ct. Jan. 22, 2002)).

MacMillan's reliance on the proposition that merely telling someone your reason for leaving an employer is not solicitation is misplaced given the undisputed facts. MacMillan did not simply accept calls from other PartyLite Consultants during which she explained she was leaving PartyLite. Rather, according to the evidence relied on by PartyLite, MacMillan engaged in an orchestrated scheme in which she initiated contact with Consultants for the express purpose of informing them that she was joining Park Lane, readily discussed the benefits associated with working at Park Lane, and offered to arrange a meeting between the Consultant and a Park Lane representative (a

---

[19] MacMillan also argues that certain evidence cited by PartyLite, including correspondence between PartyLite and Park Lane's counsel and the Park Lane Director agreements signed by former PartyLite employees, is insufficient to demonstrate solicitation. The weight to be afforded this evidence is a question for the jury subject to the Court's ruling on any motions *in limine* relating to the admissibility of such evidence.

[20] The facts strongly suggest that while MacMillan and Park Lane had every intention of soliciting PartyLite Consultants, they engaged in a dubious attempt to structure their activities so as to avoid liability.

representative who, coincidentally, was available to immediately meet with an interested Consultant).

Massachusetts courts have recognized that "[a]s a practical matter, the difference between accepting and receiving business, on the one hand, and indirectly soliciting on the other, may be more metaphysical than real ... ." *Alexander & Alexander, Inc. v. Danahy*, 488 N.E.2d 22, 30 (Mass. App. Ct. 1986). In this case, however, there is a meaningful difference between MacMillan initiating a telephone call or meeting with a PartyLite Consultant (often under the guise that the meeting related to PartyLite business) and the Consultant independently initiating contact with MacMillan to discuss a move to Park Lane. *See Getman v. USA Holdings Corp.*, 19 Mass. L. Rep. 679, 2005 WL 2183159, at *4-5 (Mass. Super. Ct. Sept. 1, 2005) (noting that when an insurance agent communicates with former client to explain reasons for joining new firm and provide description of new company, the discussion may potentially constitute solicitation when the insurance agent, not the client, initiated the discussion); *see also State Street Corp. v. Barr*, 10 Mass. L. Rep. 599, 1999 Mass. Super. LEXIS 432, at *12–14 (Mass. Super. Ct. Oct. 25, 1999) (where former employees who were prohibited from direct or indirect solicitation of plaintiffs' principals made calls to principals, and headhunter also called principals on behalf of former employees' new company, this evidence supported plaintiff's claim that non-solicitation agreement was violated).[21]

---

[21] This case is distinguishable from *Wolverine Proctor & Schwartz, Inc. v. Aeroglide Corp.*, 402 F.Supp.2d 365 (D. Mass. 2005), where the court found that a manufacturer did not indirectly solicit a competitor's employee in violation of a non-solicitation provision. In that case, the employee initiated contact with the manufacturer (an exception explicitly set forth in the agreement) upon receiving the manufacturer's contact information from a friend who was neither employed nor acting as the agent of the manufacturer. *Id.* at 370. In contrast, record evidence indicates that MacMillan used her knowledge as a Senior Regional Vice President with PartyLite to actively contact PartyLite's Consultants with the goal of persuading them to join Park Lane.

Considering the evidence of record, PartyLite has made a persuasive showing from which a reasonable juror could find that MacMillan solicited certain PartyLite Consultants to join Park Lane while she was still associated with PartyLite, in violation of the non-solicitation clause in the leader Agreement. As for other PartyLite Consultants, the evidence is not as persuasive that MacMillan's efforts constituted solicitation. Nevertheless, there is certainly sufficient evidence in the record from which a reasonable juror could conclude that MacMillan "promoted" or "actively represented" Park Lane prior to the termination of her relationship with Party Lite.[22] Regardless of the persuasiveness of PartyLite's evidence, there are, at a minimum, disputed material facts which must be resolved by the jury. Summary judgment on the issue of whether MacMillan breached the non-solicitation provision in the Leader Agreement is therefore denied.

## Breach of the Consultant Agreement (Count II)

PartyLite claims that MacMillan breached the Consultant Agreement by, *inter alia*, using PartyLite's proprietary information in order to further her scheme to recruit PartyLite Consultants to join Park Lane, disparaging PartyLite, misrepresenting PartyLite's financial condition, and misrepresenting the enforceability of PartyLite's contracts with its Consultants. Complaint, ¶ 66.

MacMillan argues that she is entitled to summary judgment on Count II of the Complaint because the Consultant Agreement "she [admittedly] signed in 1993 does not purport to MacMillan's alleged misconduct." In response, PartyLite contends that MacMillan breached the Consultant

---

[22] Because there is substantial evidence in the record that would support a finding that MacMillan "solicited" PartyLite Consultants to terminate their relationship with PartyLite and go to work for ParkLane, it is unnecessary to address whether the "otherwise attempt to persuade" language in the non-solicitation provision is ambiguous for purposes of ruling on the motions for summary judgment. Nonetheless, the Court notes that terms "solicit" and "persuade" are likely to have similar meanings under Massachusetts law. *See William Gallagher Associates Ins. Brokers, Inc. v. Everts, II*, 13 Mass. L. Rep. 716, 2001 WL 1334763, at *8 (Mass. Super. Ct. Sept. 6, 2001) (recognizing that the term "solicit" denotes more than simple contact; it consists of "an attempt to obtain something by persuasion, or to ask for the purpose of receiving.") (citing Black's Law Dictionary 1248 (5th ed. 1979)).

Agreement by failing to "positively promote" PartyLite, protect its confidential information, and follow PartyLite's policies and procedures.  PartyLite also contends that MacMillan breached the implied covenant of good faith and fair dealing by depriving PartyLite of the fruits of the Consultant Agreement.[23]

PartyLite's principal contention is that the Consultant Agreement incorporated by reference certain "company procedures," including those set forth in a "Consultant Guide" (*i.e.*, the "Policies and Procedures").  *See, e.g.*, Complaint (Dkt. 1), ¶ 32.  "A document may be incorporated by reference in a contract if the contract specifically describes the document and expresses the parties' intent to be bound by its terms." *Microsoft Corp. v. Big Boy Distribution LLC*, 589 F.Supp.2d 1308, 1319 (S.D. Fla. 2008); *see also Chicopee Concrete Service, Inc. v. Hart Engineering Co.*, 498 N.E.2d 121, 122 (Mass. 1986) (incorporation of subcontract into contract must be clearly stated). The   requirement that the contract language be explicit or otherwise clear and precise for incorporation does not amount to a rule that the parties must use a rote phrase or some other magic words in order to effect an incorporation by reference. Rather, it is sufficient if the general language of the incorporation clause reveals an intent to be bound by the terms of the collateral document.

---

[23] PartyLite does not move for summary judgment on its claim for breach of the Consultant Agreement. Moreover, as noted, it is likely irrelevant whether the Consultant Agreement is interpreted to incorporate the Policies and Procedures because MacMillan expressly agreed to comply with those very Policies and Procedures when she signed the Leader Agreement.  The Leader Agreement provided in pertinent part: "This Agreement, along with my Consultant Agreement, the Company's policies and procedures contained in the Consultant Business Guide (the "Guide"), the Compensation Plan (the "Plan"), and the Program govern my participation as a Leader in the Program.").

*Microsoft Corp.*, 589 F.Supp.2d at 1319 (citing *Sharpe v. Lytal & Reiter, Clark, Sharpe, Roca, Fountain, Williams*, 702 So.2d 622, 623 (Fla. 4th DCA 1997)).[24]

The parties' dispute with respect to the scope of the Consultant Agreement is basically one of contract interpretation. It is well-settled under both Florida and Massachusetts law that the interpretation of a contract is generally a question of law. *Gainesville-Alachua County Reg'l Airport Auth. v. R. Hyden Constr., Inc.*, 766 So.2d 1238, 1239 (Fla. 1st DCA 2000); *Peacock Construction Co. v. Modern Air Conditioning, Inc.*, 353 So.2d 840, 842 (Fla. 1977); *Edmonds v. United States*, 642 F.2d 877, 881 (1st Cir. 1981) (applying Massachusetts law); *Freelander v. G. & K. Realty Corp.*, 258 N.E.2d 786, 788 (Mass. 1970). If the contract contains ambiguities, however, a question of fact for the jury may be presented. *Quayside Associates, Ltd. v. Harbour Club Villas Condominium Assoc.*, 419 So.2d 678, 679 (Fla. 3d DCA 1982); *Gillentine v. McKeand*, 426 F.2d 717, 721 (1st Cir.

---

[24] Even if the Policies and Procedures were not expressly incorporated by reference into the Consultant Agreement, the Policies and Procedures themselves *may* under certain circumstances form the basis of an express or implied contract between MacMillan and PartyLite. *See Singleton v. Sinclair Broadcast Group, Inc.*, 660 F.Supp.2d 136, 154 (D. Mass. 2009); *Walton v. Health Care Dist. of Palm Beach County*, 862 So.2d 852, 855-56 (Fla. 4th DCA 2003) (acknowledging that an employee handbook or manual can serve as an employment contract); *University of Fla. v. Collins*, 678 So.2d 503, 507 (Fla. 1st DCA 1996)(equating employee handbook with employment contract to determine compensation for sick leave); *see also O'Brien v. New England Tel. & Tel. Co.*, 664 N.E.2d 843, 847 (Mass. 1996) ("The principle that promises made in a personnel manual may be binding on an employer is accepted in a clear majority of American jurisdictions ... . The idea that an employer may ignore promises made in personnel manual is in increasing disfavor in this country."). *But cf. Quaker Oates Co. v. Jewell*, 818 So.2d 574, 576-77 (Fla. 5th DCA 2002) ("It is well established Florida law that policy statements contained in employment manuals do not give rise to enforceable contract rights in Florida unless they contain specific language which expresses the parties' explicit mutual agreement that the manual constitutes a separate employment contract."). In this regard, the Policies and Procedures expressly refers to the Consultant Agreement when outlining the obligations of a PartyLite Consultant. *See* Policies and Procedures (Dkt. 54), p. 59.

1970) (applying Massachusetts law); *Trafton v. Custeau*, 155 N.E.2d 159, 161 (Mass. 1959).[25] The

determination of whether the terms of a contract are ambiguous is a question of law. *Centennial*

*Mortgage, Inc. v. SG/SC, Ltd.*, 772 So.2d 564, 565-66 (Fla. 1st DCA 2000); *RCI Northeast Servs.*

*Div. v. Boston Edison Co.*, 822 F.2d 199, 202 (1st Cir.1987) (applying Massachusetts law).[26]

Contract language is ambiguous "if it is susceptible of more than one meaning and reasonably

intelligent persons would differ as to which meaning is the proper one." *Citation Ins. Co. v. Gomez*,

688 N.E. 2d 951, 953 (Mass. 1998); *accord Fashion House, Inc. v. K Mart Corp.*, 892 F.2d 1076,

---

[25] Florida and Massachusetts courts have both recognized the limited instances in which issues of contract interpretation are properly resolved on summary judgment. *See Land O'Sun Realty Ltd. v. REWJB Gas Inv.*, 685 So.2d 870, 872 n. 3 (Fla. 3d DCA 1996) ("Contract interpretation is for the court as a matter of law, rather than the trier of fact, only when the agreement is totally unambiguous, or when any ambiguity may be resolved by applying the rules of construction to situations in which the parol evidence of the parties' intentions is undisputed or non-existent"), *review dismissed sub nom., Lennar Florida Partners, I v. REWJB Gas Inv.*, 710 So.2d 978 (Fla. 1998); *Hibiscus Associates Ltd. v. Board of Trustees of Policemen and Firemen Retirement System of Detroit*, 50 F.3d 908, 919 (11th Cir. 1995) (applying Florida law) ("Generally, the proper construction of an ambiguous contract term is a question of fact which should be reserved to the jury.") (citing *Fecteau v. Southeast Bank, N.A.*, 585 So.2d 1005, 1007 (Fla. 4th DCA 1991)); *Boston Five Cents Sav. Bank v. Department of Hous. & Urban Dev.*, 768 F.2d 5, 8 (1st Cir. 1985) (applying Massachusetts law) ("an argument between parties about the meaning of a contract is typically an argument about a 'material fact'" and noting that summary judgment is appropriate only when "no 'reasonable person' could differ about what the contract means, either because the language is unambiguous or the supporting evidence is sufficiently one-sided.").

[26] While it is true that ambiguous contract provisions are normally construed against the drafter, *see Electronic Data Sys. Corp. v. Attorney Gen.*, 798 N.E.2d 273, 275 (Mass. 2003), it is also well established that in the event an "ambiguity exists in a contract construction, the court should arrive at an interpretation 'consistent with reason, probability, and the practical aspect of the transaction between the parties.'" *Paneson v. Paneson*, 723 So.2d 385, 386 (Fla. 2d DCA 1999) (quoting *Biltmore Sys., Inc. v. Mai Kai, Inc.*, 413 So.2d 458, 459 (Fla. 4th DCA 1982)); *see President & Fellows of Harvard College v. PECO Energy Co.*, 787 N.E.2d 595, 601 (Mass. App. Ct. 2003) (fact finder's task with respect to construction of an ambiguous contract provision is to arrive at a reasonable construction in light of the intentions of the parties at the time of formation of the contract). Thus, courts often refer to this rule of construction as applicable only after review of extrinsic evidence is itself insufficient to allow the court to resolve the ambiguity. *See Lanier v. Professional Services, Inc. v. Ricci*, 192 F.3d 1, 4-5 (1st Cir. 1999) (applying Massachusetts law) (affirming district court's invocation of rule of strict construction after review of extrinsic evidence failed to resolve contractual ambiguity); *Arriaga v. Florida Pacific Farms, L.L.C.*, 305 F.3d 1228, 1248 (11th Cir. 2002) (applying Florida law); *see also Optowave Co. Ltd. v. Nikitin*, No. 6:05-cv-1083-Orl-22DAB, 2006 WL 3231422, at *11 (M.D. Fla. Nov. 7, 2006) (citing *Arriaga v. Florida Pacific Farms, LLC*, 305 F.3d 1228, 1248 (11th Cir. 2002)) ("[A]s a last resort, if the ambiguity cannot be resolved or the parties intent cannot be derived from extrinsic evidence, the ambiguous term is to be construed against the drafter because the party against whom it operates had the possibility of drafting the language so as to avoid the dispute."); *cf. University of Miami v. Frank*, 920 So.2d 81, 87-88 (Fla. 3d DCA 2006) (noting that the real significance in finding ambiguity is not automatically mandate resolution of ambiguity against drafter, but rather to allow the court to consider parol evidence).

1083 (1st Cir. 1989) (applying Massachusetts law) (contract terms are considered ambiguous "where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable difference of opinion as to the meaning of the words employed"); *Smith v. Shelton*, 970 So.2d 450, 451 (Fla. 4th DCA 2007); *State Farm Fire & Cas. Co. v. De Londono*, 511 So.2d 604, 605 (Fla. 3d DCA), *rev. dismissed,* 519 So.2d 988 (Fla. 1987). "However, a true ambiguity does not exist merely because a document can possibly be interpreted in more than one manner." *Lambert v. Berkley S. Condo. Ass'n*, 680 So.2d 588, 590 (Fla. 4th DCA 1996) (citation omitted).

Under Florida law, extrinsic evidence is admissible regarding the intent of parties to a contract if a latent ambiguity exists. *United States on Behalf of Small Bus. Admin. v. S. Atl. Prod. Credit Ass'n*, 606 So.2d 691, 695 (Fla. 1st DCA 1992); *see also Danforth Orthopedic Brace & Limb, Inc. v. Florida Health Care Plan, Inc.*, 750 So.2d 774, 776 (Fla. 5th DCA 2000) (quoting *Lemon v. Aspen Emerald Lakes Assocs., Ltd.*, 446 So.2d 177 (Fla. 5th DCA 1984)) ("It is a well-established legal principle that if a written contract is ambiguous so that the intent of the parties cannot be understood from an inspection of the instrument, extrinsic or parol evidence ... may be received in order to properly interpret the instrument.").[27] "A latent ambiguity arises when a contract on its face

---

[27] Massachusetts also provides for the admissibility of extrinsic evidence when construing an ambiguous contract. *See Parrish v. Parrish*, 566 N.E.2d 103, 108-09 (Mass. App. Ct. 1991) (extrinsic evidence pertaining to background and purpose of parties and their understanding of meaning of particular language may be considered in construing ambiguous contract language); *see also Haverhill v. George Brox, Inc.*, 716 N.E.2d 138 (Mass. App. Ct. 1999) (when faced with ambiguity in contract, intent of parties is to be discerned from words in question, entire instrument, and circumstances surrounding agreement).

appears clear and unambiguous, but fails to specify the rights or duties of the parties in certain situations." *Jenkins v. Eckerd Corp.*, 913 So.2d 43, 52-53 (Fla. 1st DCA 2005).[28]

While the Consultant Agreement does not expressly incorporate all of PartyLite's policies and procedures, the Consultant Agreement does require a Consultant to incorporate "the Company recommended guidelines and procedures concerning product representations, consumer incentive programs, and contests and promotional programs made available to the Consultants by the Company."[29] This language could be interpreted to mean that a Consultant would only be required to use the "recommended guidelines and procedures" when selling PartyLite products. Alternatively, it could be interpreted to simply encourage a Consultant to use "recommended guidelines and procedures" when selling PartyLite products. A third interpretation, one advanced by PartyLite, is

---

[28] Florida courts recognize two types of ambiguities – patent and latent. *Nationwide Mut. Fire Ins. Co. v. Pollinger*, 42 So.3d 890, 892 (Fla. 4th DCA 2010). The Eleventh Circuit, quoting from Florida case law, described the distinction as follows:

> "[A] patent ambiguity is that which appears on the face of the instrument and arises from the use of defective, obscure, or insensible language. Extrinsic evidence is inadmissible if the ambiguity is patent, because such evidence would, in effect, allow the court to rewrite the contract for the parties by supplying information the parties themselves did not choose to include. A latent ambiguity, on the other hand, is said to exist where a contract fails to specify the rights or duties of the parties in certain situations and extrinsic evidence is necessary for interpretation or a choice between two possible meanings. In such instance, this evidence is required because the instrument itself does not provide sufficient insight into the intent of the parties. *Crown Mgmt. Corp. v. Goodman*, 452 So.2d 49, 52 (Fla. 2d DCA 1984) (citations omitted)."

*Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1310 (11th Cir. 1998); *see also Optowave Co. Ltd. v. Nikitin*, No. 6:05-cv-1083-Orl-22DAB, 2006 WL 3231422, at *11 (M.D. Fla. Nov. 7, 2006) (citing *United States o/b/o Small Business Administration v. South Atlantic Production Credit Assoc.*, 606 So.2d 691, 695 (Fla. 1st DCA 1992)).

[29] The Consultant Agreement provides in pertinent part:

> The Consultant agrees that he/she is an independent business person free to conduct business according to his or her own methods while incorporating the Company recommended guidelines and procedures concerning product representations, consumer incentive programs, and contests and promotional programs made available to Consultants by the Company.

that it requires a Consultant to abide by the "guidelines and procedures" for all purposes during their relationship with PartyLite.

The limited scope of the Consultant Agreement further suggests that the Consultant Agreement it is not a totally integrated document that can reasonably be construed without reference to other documents.[30] For example, the Consultant Agreement provided that a Consultant would be an independent contractor compensated on a commission basis, but the commission rate was not specified in the Consultant Agreement and was to be determined by PartyLite. *See* Consultant Agreement (Dkt. 50, Ex. 36). Similarly, the Consultant Agreement contains a provision entitling Consultants to commissions on downline sales or the ability to participate in other incentive programs offered by PartyLite.[31] Accordingly, the Consultant Agreement contains a latent ambiguity in that it fails to specify all of the rights and duties of the parties.

Construed in the light most favorable to the non-moving party (*i.e.*, PartyLite), there is sufficient ambiguity in the Consultant Agreement to raise a question of fact as to whether that document incorporated by reference all of PartyLite's Policies and Procedures. As a result, MacMillan is not entitled to summary judgment in her favor on Count II of the Amended Complaint. *See Aftermarket, Inc. v. Worcester Ins. Co.*, 2009 WL 1373917, at *3-5, 906 N.E.2d 368 (Mass. App. Ct. May 19, 2009) (unpublished opinion) (reversing JNOV on ground that jury correctly construed insurance policy to provide insurance coverage for lost business income); *In re Citigroup Capital*

---

[30] *Cf.* Restatement (Second) of Contracts § 204 (1981) ("When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court."); *Fay, Spofford & Thorndike, Inc. v. Massachusetts Port Auth.*, 387 N.E.2d 206, 210 (Mass. App. Ct. 1979) (applying Restatement (Second) of Contracts § 204).

[31] The fact that the Consultant Agreement references contests and promotional programs offered by PartyLite in the same paragraph, and in the same context, as the "procedures," bolsters the conclusion that the agreement is ambiguous.

*Accumulation Plan Litig.*, MDL No. 1354, 2008 WL 3982065, at *5 (D. Mass. Aug. 8, 2008) (noting "findings of fact might involve contested issues of material fact sufficient to preclude summary judgment"); *Smith v. Shelton*, 970 So.2d 450, 451 (Fla. 4th DCA 2007) ("Where the wording of an agreement is ambiguous, its interpretation involves question of fact, precluding summary disposition."); *Seaco Ins. Co. v. Barbosa,* 761 N.E.2d 946, 951 (Mass. 2002) (reversing summary judgment, noting that when a contract has terms that "are ambiguous, uncertain or equivocal in meaning, the intent of the parties is a question of fact to be determined at trial"); *Commercial Union Ins. Co. v. Boston Edison Co.*, 591 N.E.2d 165, 172 (Mass. 1992) (interpretation of ambiguous contract is question of fact for the jury); *Weingart v. Allen & O'Hara, Inc.*, 654 F.2d 1096, 1104 (5th Cir. 1981) (applying Florida law) (reversing JNOV on ground that scope of release in settlement agreement was ambiguous and subject to resolution by trier of fact); *Hoffman v. Terry*, 397 So.2d 1184, 1184 (Fla. 3d DCA 1981) (holding that when agreement is reasonably susceptible to more than one construction, issue is properly submitted to jury for resolution as a matter of fact); *Hurt v. Leatherby Ins. Co.*, 380 So.2d 432, 43334 (Fla. 1980) (reversing order granting summary judgment based on existence of latent ambiguity).

## Damages

MacMillan argues that she cannot be held liable for damages arising from"indirect" solicitation (*i.e.*, damages attributable to individuals solicited to join Park Lane by an individual solicited to join Park Lane by MacMillan) or for damages arising from her recruitment of individuals that did not join Park Lane.  MacMillan also argues that she cannot be liable for damages relating to losses suffered as result of Mary Grace Lewandowski's move from PartyLite to Park Lane (conduct which apparently occurred prior to MacMillan's initial contact with Park Lane).

These contentions include fact intensive issues of causation and damages not subject to resolution on the record. *See Action Nissan, Inc. v. Hyundai Motor America*, 617 F.Supp.2d 1177, 1203 (M.D. Fla. 2008) ("Generally, so long as Plaintiff has produced some evidence of its injury, the factual determination of damages is one for the jury.") (citing *Fisher Island Holdings, LLC v. Cohen*, 983 So.2d 1203, 1204 (Fla. 3d DCA 2008)). As a result, MacMillan's request for summary judgment relating to the nature and amount of damages recoverable by PartyLite is due to be denied.

### CONCLUSION

Disputed issues of material fact, including issues of witness credibility, preclude summary judgment on the parties' motions with respect to whether MacMillan breached the Leader Agreement and the damages suffered by PartyLite as a result of any such breach. Additionally, disputed issues of material fact preclude summary judgment in favor of MacMillan on PartyLite's claim that she breached the Consultant Agreement. Accordingly, it is **ORDERED**:

(1)     Plaintiff's Motion for Partial Summary Judgment as to Liability for Breach of Contract (Dkt. 51) is **DENIED**.

(2)     Defendant's Motion for Summary Judgment (Dkt. 49) is **DENIED**.

**DONE AND ORDERED** this _10th_ day of September, 2012.

JAMES D. WHITTEMORE
**United States District Judge**

Copies to: Counsel of Record

32